File Name: 05a0832n.06
Filed: October 7, 2005

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**No. 04-1366**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| KEVIN KING, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CHUCK ZAMIARA, | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellee. | ) | |

Before: **MERRITT and ROGERS, Circuit Judges; and HOOD,**[*] **District Judge.**

**ROGERS, Circuit Judge.** Plaintiff Kevin King, a Michigan prisoner proceeding *pro se*, appeals

the district court's grant of summary judgment to defendants, all of whom are employees with the

Michigan Department of Corrections ("MDOC"), in this prisoner civil rights suit. Specifically, King

alleges violations of 42 U.S.C. §§ 1983, 1985, and 1986. King claims that the defendants, in

retaliation for his participation in a class-action lawsuit against the MDOC and for his assistance in

helping other inmates file grievances against the prison, (1) made false claims of misconduct against

him, (2) transferred him to another prison, (3) and increased his security level. King also claims that

the defendants violated his due process rights by placing him in segregation without an investigation

---

[*]The Honorable Judge Joseph M. Hood, Chief United States District Judge for the Eastern
District of Kentucky, sitting by designation.

or an opportunity to be heard. Finally, King claims that the defendants conspired to violate his constitutional rights and failed to prevent a violation of his rights.

Because King has presented a genuine issue of material fact regarding his retaliation claim based on his increased security level, the grant of summary judgment is reversed in part. We remand this sole retaliation claim to the district court to determine whether defendants are entitled to qualified immunity. King failed to object in the district court to the magistrate's findings regarding his due process and conspiracy claims, and, therefore, we do not review those claims.

## I. Background

King is incarcerated with the MDOC. At all times relevant to this case, King was housed at either Brooks Correction Facility ("Brooks") or Chippewa Correctional Facility ("Chippewa"). King alleges that the following defendants (to whom we refer collectively as "the officials") violated, conspired to violate, and/or failed to prevent a violation of, his First and Fourteenth Amendment rights: (1) Chuck Zamiara, correctional facility administrator for the MDOC; (2) Curtis Chaffee, transfer coordinator at Brooks; (3) Bonnie Lewis, corrections officer at Brooks; (4) Sharon Wells, resident unit manager at Brooks; (5) Michael Singleton, acting deputy warden at Brooks; (6) Mary Berghuis, warden at Brooks; (7) Terry Swift, transfer coordinator at Chippewa; and (8) Dan Bolden, deputy director of the MDOC.

On September 17, 1999, King was transferred to Brooks. Complaint 3.[1] King claims that upon his arrival at Brooks an unknown officer told him that "[w]e are fully aware of who you are, we have been expecting you and have something you'll never forget." Complaint 3. King claims that this statement referred to his involvement in the class-action lawsuit *Cain v. Michigan Department of Corrections*, Court of Claims, Nos. 88-61119-AZ, 93-14975-CM, 96-16341-CM.[2] Complaint 3. King claims that Defendant Wells, on September 24, 1999, ordered another MDOC staff member to write a Notice of Intent to Classify King to Segregation and indicated that "Prisoner King is attempting to incite a demonstration amongst the prisoners. It is for the safety and security of the institution that King be placed in segregation pending investigation." Complaint Exhibit A.

King subsequently became "Chairman of the Warden's Forum" at Brooks. Complaint 4. Pursuant to MDOC policy, the role of prisoner representatives on the Warden's Forum "is to assist with the identification and resolution of prisoner concerns . . . [and to] function in an advisory capacity." Complaint Exhibit C. King submitted one affidavit each from two prisoners stating that they were uneducated in the law and that they would have been unable to seek effective redress for their grievances without King's assistance. Complaint 19-20. He also submitted an affidavit from

---

[1]"Complaint" refers to King's First Amendment Complaint. There is no Joint Appendix for this appeal.

[2]The *Cain* class-action lawsuit was brought on behalf of all present and future male prisoners in the MDOC, and it concerned prisoners' access to the courts, personal property rights, and classification and placement of prisoners. *See* Prison Legal Services of Michigan Amicus Br. 1-2.

a translator for Spanish-speaking prisoners stating that King's assistance was needed for those prisoners to seek effective redress of their grievances. Complaint 18.

King was charged with a major misconduct violation on February 19, 2000, for being "out of place." Complaint 5. King claims that he was charged with this violation at the instruction of Defendant Wells. Complaint 4. Although the hearing officer's report is hard to decipher, the officer found that King was placed on and violated toplock status. Complaint Exhibit D. Toplock status "consists of confinement to the prisoner's cell except for limited release periods[.]" *See Goodell v. Trombley*, No. 01-10103-BC, 2002 WL 1041734, at *6 (E.D. Mich. May 23, 2002). The hearing officer, however, found King not guilty because the hearing officer determined that King lacked notice of his restricted toplock status at the time of the violation. Complaint Exhibit D.

On March 31, again allegedly at the instruction of Defendant Wells, Defendant Lewis charged King with a major misconduct violation for "creating a disturbance." Complaint 4-5. King was also found not guilty of this charge. The hearing officer found that, because Officer Lewis made inconsistent statements to her supervisor and the hearing officer, she was biased and not credible. Complaint Exhibit E. King alleges that these charges were brought against him in retaliation for his "own written complaints and assistance to other prisoners via the Warden's Forum and Departmental Grievance Procedure." Complaint 4.

On April 20, 2000, Defendant Wells wrote a memorandum requesting that King be transferred because

> He is becoming increasingly more powerful in the eyes of the prisoners in the Conklin Unit. He has made the statement to a unit officer that "these guys in the unit will do whatever I ask" and "if I wanted to cause a disturbance I could anytime." Prisoners have also approached me on several occasions with different types of request[s] and when refused they will either state that "they will get with someone who will take [care] of it" and when the grievance is written it is more often than not written by prisoner King or they will state that they will make sure "King knows about this." The most recent situation in where [sic] King was found not guilty on a Creating a Disturbance, has boosted King's status in the unit with the prisoners. I believe it should be considered a security risk to the unit officers when prisoner Kings' [sic] authority over other prisoners is higher th[a]n the officers working in the unit . . . . I am asking for permission to move him on the next move day, 4-26-00.

Complaint Exhibit F.

On May 8, 2000, Defendant Chaffee filled out a Security Classification Screen, on which he wrote "manageable in level II/remain in level II" in reference to King. He sent the following email to Defendant Zamiara:

> Deputy Harry has asked for [King] to be transferred to an alternate Level II. We are asking for DRF placement. The reason for [this] request is that he has been at [Brooks] for 6 months [and] during this time, he has developed a cadre of followers over whom he has substantial influence. It seems that he can instigate them to create problems (grievances, complaints to Warden's Forum, etc.) while he remains uninvolved directly. Currently he is printing out grievances about various issues and having other prisoners sign them and send them in. Deputy Harry has asked for a "break" from prisoner King and would accept him back after a period of time.

Complaint Exhibit H.

Defendant Zamiara responded, "Let's send him to [Chippewa] as a level III, note in the departure, prisoner is perceived as a disruptive prisoner who is manipulating others to create unrest at [Brooks]." Complaint Exhibit H. Plaintiff was transferred on May 17, 2000, to Chippewa, located in the Upper Peninsula of Michigan, at increased security level III. King asserts that the

- 5 -

decision to transfer him to Chippewa was done for retaliatory purposes. King offers the following

emails, sent between Defendants Zamiara and Berghuis, on June 14, 2000, as evidence that the

officials altered paperwork to conceal the fact that King had previously been declared "manageable":

> **[Zamiara to Berghuis:]** Pete Govorchin called about the transfer order and security classification screen prepared at [Brooks] in May when Prisoner King was transferred to [Chippewa]. It appears the documents were prepared before the request was made to transfer the prisoner. Prisoner King was not approved for DRF level II but instead as a departure to level III and transfer to Chippewa. New documents (transfer order and screen) should have been done, they were not, hand written changes on the documents prepared to send King to DRF are a concern in that King is involved in the prisoner law suit that is before Judge Giddings['] court, and the issue of retaliation may be raised.
>
> I will fax the copies of the T.O. [transfer order] and S.C.S. [security classification screen] to you[.] [C]ould you have your staff re-do these and indicate that transfer to [Chippewa] level III and the one level departure was done because Prisoner King is perceived as a disruptive prisoner who is manipulating others to create unrest at [Brooks?]
>
> Mr. Govorchin also ask[ed] that I advise you that staff from [Brooks] may be called to court to answer questions concerning Prisoner King's transfer to [Chippewa].
>
> Please let me know if you have any questions. Let me know when you get the e-mail and I will fax the other documents to you. Thanks.

> **[Berghuis to Zamiara:]** I have reviewed your E-mail . . . and also got the faxed documents. I will have staff correct. How should the corrections be routed?

> **[Zamiara to Berghuis:]** Just have them [sent] to [Chippewa] to replace the documents from May. I will copy Terry Swift the transfer coordinator at [Chippewa] the e-mails so she will have the background.

Complaint Exhibit K. That same day, June 14, 2000, Defendant Swift emailed Defendant Berghuis

the following message: "Will the paperwork mentioned in the attachment be coming to [Chippewa]

addressed to me? Just want to be sure I know where to look for it so that I can ensure that it gets to the file and the old one is removed." Complaint Exhibit L.

The note on the security classification screen in King's MDOC files was changed from "manageable in level II/remain in level II" to "prisoner manipulates other prisoner to be disruptive/needs high level of security." Complaint Exhibits G and M. King alleges that the documents were backdated and signed by Defendants Berghuis and Singleton, and then forwarded to Defendant Swift. Complaint 6-7. A subsequent investigation by the Office of Legislative Corrections Ombudsman determined:

> [Zamiara's] directions to depart Mr. King to level 3 and his subsequent directions to Warden Berghuis to change Mr. King's security classification screen has the appearance of punishing Mr. King for involvement in an unpopular lawsuit against the Department[.]
>
> In conclusion, the record gives the distinct impression that his increase in custody was done for discussing issues with other prisoners, which may have prompted them to file grievances or complaints with the [Brooks] administration. No other explanation of how Mr. King manipulated other prisoners to create unrest at [Brooks] was provided in his grievance responses or elsewhere documented in his records."

Complaint Exhibit S. The Ombudsman noted that, because King was behaved well for 90 days while at level III, King should have been transferred to level II on August 13, 2000. The Ombudsman's decision suggests that Defendant Zamiara denied the transfer to level II until March 7, 2001, when King was moved to another facility. *See* Complaint Exhibit S.

King also submits grievances he filed in October and December 2001 as additional evidence of protected conduct for which he was punished. *See* Complaint Exhibits N and O.

- 7 -

King filed this civil action in the District Court for the Western District of Michigan on July 26, 2002, and he filed an amended complaint on December 2, 2002. The complaint sought declaratory relief and monetary damages. Complaint 1. The officials filed a Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(b) on April 1, 2003. The magistrate issued her report and recommendation on January 23, 2004. She concluded that all the officials were entitled to summary judgment. Specifically, she determined that King had not engaged in any form of protected conduct before the alleged retaliation and that, even if King had engaged in protected conduct, such conduct was not "a motivating factor" in the alleged retaliation. In addition, the magistrate determined that King was not denied due process by being placed in segregation without an investigation or hearing because segregation was not "a typical and significant" hardship that implicated a liberty interest. Finally, the magistrate determined that, because King did not establish that his constitutional rights had been violated, his conspiracy claims also failed.

King filed his objections to the magistrate's report on February 3, 2004. King objected to the magistrate's recommendations to dismiss the retaliation claims but not to the magistrate's conclusions as to his due process or conspiracy claims. On March 5, 2004, the district court adopted the magistrate's report and thus granted summary judgment in favor of the officials. King appeals the district court's grant of summary judgment as to his retaliation claims, his due process claim, and his conspiracy claims. The officials have not filed a brief for this appeal.

## II. Analysis

Although the district court engaged in a careful and thoughtful analysis, we conclude, based on our *de novo* review, that King has presented a genuine issue of material fact regarding his claim that the officials increased his security level to retaliate for his participation in the *Cain* class action and his legal assistance to other prisoners. We therefore reverse the district court's grant of summary judgment in favor of the officials as to that claim and remand for the district court to determine whether the officials are entitled to qualified immunity.[3] We affirm, however, the district court's grant of summary judgment regarding all of King's other retaliation claims. Because King failed to preserve his due process and conspiracy claims for appeal, we do not review those claims.

A.      *Standard of Review*

A district court's grant of a motion for summary judgment is reviewed *de novo*. *Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 616 (6th Cir. 2003). In reviewing such a grant,

---

[3]We do not resolve the issue of qualified immunity at this time because the parties did not sufficiently brief the issue at the district court or on appeal. *See Dominique v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987) (stating that good practice requires that the parties address the issue of qualified immunity in the district court). Since there is sufficient evidence of a constitutional violation to survive summary judgment, whether the officials are entitled to qualified immunity depends on whether the violation was "clearly established." *See Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2001). Ultimately, whether increasing an inmate's security level in retaliation for his participation is protected activity under the First Amendment is a "clearly established" violation depends on how the violation is characterized, *see Brosseau v. Haugen*, 125 S. Ct. 596, 599 (2005), and whether federal caselaw would put a reasonable official on notice that his conduct was unlawful at the time of the alleged violation, *see Siggers-El v. Barlow*, 412 F.3d 693, 703 (2005); *see also Saucier v. Katz,* 533 U.S. 194, 202 (2001). The officials argued in the district court that they were entitled to qualified immunity solely on the grounds that no constitutional violation occurred; they did not address the "clearly established" factor. We do not determine whether increasing an inmate's security level for engaging in protected conduct was a "clearly established" constitutional violation in May 2000, and it is prudent for us to have the district court decide the issue in the first instance.

this court's review is limited to whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . [so] that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In so deciding, we "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The generous summary judgment standard is further relaxed when a petitioner proceeds pro se. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

B.    *King can withstand summary judgment as to his retaliation claim based on his increased security level.*

King has presented a genuine issue of material fact as to whether the officials increased his security level because of his litigation activities. King engaged in protected conduct by participating in the *Cain* class action and assisting inmates as the representative to the Warden's Forum. He has produced sufficient evidence for a reasonable jury to find that the officials took the adverse action of increasing his security level because he engaged in litigation. King has not produced sufficient evidence, however, for his other retaliation claims to withstand summary judgment.

A prisoner's claim that prison officials retaliated against him for engaging in protected conduct is grounded in the First Amendment. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 388 (6th Cir. 1999) (en banc). To prove a retaliation claim, King must show that: (1) he engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated, at least in part,

by his protected conduct. *Id.* at 394. King has satisfied these requirements for only his retaliation claim based on his increased security level.

> *1. King's participation in the* Cain *class action and his legal assistance to other prisoners were activities protected under the First Amendment.*

King produced sufficient evidence to establish that he engaged in two forms of conduct protected under the First Amendment when he challenged his prison conditions in the *Cain* class action and assisted prisoners in filing grievances as the representative to the Warden's Forum. King also argues that filing grievances on his own behalf in 2001 constituted protected conduct. The magistrate determined that King had not engaged in any protected conduct. Magistrate's Report and Recommendation 7. While the grievances King filed on his own behalf were not protected conduct, King's participation in the *Cain* lawsuit and legal assistance to inmates were protected activities.

> *a. King's participation in the* Cain *class-action lawsuit was protected conduct.*

In light of the generous standard afforded to pro se litigants in pleading their causes of action, *see Haines*, 404 U.S. at 520-21, King has sufficiently alleged that his involvement with the class action was protected conduct. Inmates have a constitutional right of access to the courts to challenge prison conditions. *See Thaddeus-X*, 175 F.3d at 391. The magistrate failed to address King's involvement in the *Cain* lawsuit as protected conduct. Admittedly, King's amended complaint is confusing on this issue. In the facts of that complaint, King alleges that he was "well-known" by the officials due to his involvement in the *Cain* lawsuit; yet, in the sections dealing with the adverse actions taken by the defendants, King does not mention the *Cain* lawsuit as a basis for

the officials' allegedly retaliatory conduct. While his pleading was artless, King sufficiently alleged his participation in the *Cain* litigation by listing his participation as the first fact of his complaint.

Moreover, after the magistrate filed her report, King objected in writing to the magistrate's determination that he had not engaged in protected conducted prior to the officials' allegedly retaliatory actions. King referred to his involvement with the *Cain* litigation, which undisputedly occurred prior to the events at issue in this case and was mentioned in his amended complaint. *See* Appellant's Objections to the Magistrate's Report and Recommendation 2. Finally, King has presented an email demonstrating that the officials knew of his involvement in the *Cain* litigation. *See* Complaint Exhibit K. King has thus presented sufficient evidence for a jury to find that he participated in the *Cain* litigation, which was protected conduct.

*b. King's legal assistance to other inmates constituted protected conduct because those he assisted had no reasonable alternatives for other legal assistance.*

Because King has offered evidence that his assistance was necessary for other inmates to access the courts, his assistance to other inmates was protected conduct. While a prisoner has a First Amendment right to file grievances against prison officials on his own behalf, "an inmate does not have an independent right to help other prisoners with their legal claims." *Thaddeus-X*, 175 F.3d at 395. This court has held, however, that an inmate engages in protected activity by providing legal assistance when his assistance is *necessary* to provide another inmate with constitutionally-protected access to the courts. *Id.* King was elected to the Warden's Forum as a representative of his housing unit pursuant to MDOC Policy 04.01.150. According to that policy, King was the person that prisoners in his unit should contact about "concerns that have not been resolved at the unit level."

Complaint Exhibit C. King was not a jailhouse lawyer merely "hanging a shingle" with hopes of attracting business; he was the appointed representative to whom the officials told other inmates to turn for the resolution of grievances.

Besides alleging that his representative status rendered his conduct protected, King has produced sufficient evidence in the form of three affidavits to demonstrate the necessity of his assistance. King submitted affidavits from two prisoners that state that they were uneducated in the law and that they would have been unable to seek effective redress without King's help. Complaint 19-20. King also submitted an affidavit from a translator for Spanish-speaking prisoners, which stated that "[m]any of the Spanish speaking prisoners are functionally illiterate in American terms" and that "[w]ithout assistance from Kevin King . . . meaningful redress would not have otherwise been available." Complaint 18. This court has previously held that similar inmate affidavits were sufficient to survive summary judgment. *See Thaddeus-X*, 175 F.3d at 395-96. The officials' conclusory rebuttal to these claims in the lower court was that King did not merely present claims but that he was "fomenting unrest." Defendants' Brief in Support of Summary Judgment 9. Thus, since prisoners were required to lodge complaints with King as a prerequisite to accessing the courts and since King has presented uncontested affidavits stating that his help was necessary, he has presented sufficient evidence that his legal assistance to others constitutes protected conduct.

> *c. Filing grievances on King's own behalf did not constitute protected conduct because King filed the grievances after the officials' alleged retaliatory conduct.*

However, because the grievances King proffers were filed after the officials allegedly took retaliatory action against him, the grievances cannot be evidence of protected conduct in this case. The filing of non-frivolous grievances is considered protected conduct. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). But, as noted by the magistrate, the October and December 2001 grievances that King presented on his own behalf were filed after the officials' allegedly retaliatory conduct in 2000. These grievances, accordingly, were not protected conduct against which the officials retaliated.

*2. King has produced sufficient evidence that the officials took adverse action against him.*

King has also presented sufficient evidence that the officials took adverse action against him when he was charged with misconduct and when he had his security level increased to level III. An adverse action "is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X*, 175 F.3d at 396 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). King alleges in his complaint three retaliatory actions: (1) false charges of misconduct, (2) increased security level, and (3) institutional transfer. Being falsely charged with a major misconduct and having one's security level increased could deter a person of ordinary firmness from exercising his First Amendment rights; accordingly, they are adverse actions. Mere transfer to a different prison, without more, is not an adverse action because transfer is insufficient to deter a person of ordinary firmness from exercising his First Amendment rights.

*a. Charging an inmate with misconduct is an adverse action.*

- 14 -

Charging an inmate with misconduct is an adverse action because serious consequences can flow from erroneous charges. *See* Magistrate's Report and Recommendation 9. King alleges that Defendants Wells and Lewis retaliated against him by falsely charging him with two major misconduct violations, one for being "out of place" and one for "creating a disturbance." King was subsequently found not guilty of both charges. This court has previously held that being charged with major misconduct is sufficient adverse action. *See Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002) (noting that a major misconduct could result in, among other things, the prisoner's segregation or loss of good time credits); *Scott v. Churchill*, No. 97-2061, 2000 WL 519148, at *2 (6th Cir. April 6, 2000). Because charging an inmate with major misconduct when the charges are subsequently determined to be unfounded could deter a person of ordinary firmness from exercising his First Amendment rights, the misconduct charges against King are adverse actions.

   b. *The increase in King's security level constituted an adverse action.*

Increasing King's custody security level was an adverse action because the result of more restrictions and fewer privileges could deter a person of ordinary firmness from engaging in protected conduct. *Cf. Friedmann v. Corr. Corp. of Am.*, No. 99-6587, 2001 WL 467990, at *3-*4 (6th Cir. Apr. 26, 2001) (noting that this court has found that transfers at the same security level are not adverse actions); *see also* Magistrate's Report and Recommendation 15. The ramifications of a security-level increase may be similar to those for major misconduct charges, such as loss of disciplinary or good time credits. Accordingly, an increase in security level may be an adverse action that could deter a person of ordinary firmness from engaging in protected conduct.

- 15 -

*c. Transferring a prisoner to another facility is not a cognizable adverse action.*

The officials' decision, however, to transfer King to Chippewa, a prison in upstate Michigan, was not an adverse action because King's transfer did not limit his ability to challenge the conditions of his confinement. As this court held in *Friedmann v. Corrections Corporation of America*, "[T]he circumstances [of the inmate's transfer] must evidence some form of deterrent effect on the inmate," which would make him less likely to engage in protected conduct. No. 99-6587, 2001 WL 467990, at *4 (6th Cir. Apr. 26, 2001). King has not alleged in any way that the transfer alone had any deterrent effect on him. It is true that in *Siggers-El v. Barlow* this court held that a transfer that causes an inmate to lose a job that pays for his attorney and causes him to have limited access to his attorney can be an adverse action because the consequences of that "transfer would deter a person of ordinary firmness from engaging in protected conduct." 412 F.3d 693, 701-02 (2005). But, unlike the inmate in *Siggers-El*, King's transfer did not deprive him of access to an attorney or deprive him from prison employment that allowed King to pay for an attorney. King, therefore, cannot demonstrate that his transfer to Chippewa constituted an adverse action that would deter one of ordinary firmness from exercising his First Amendment rights.

*3. King presented sufficient evidence to support a causal connection between his protected conduct and his increased security level.*

King satisfies the third requirement because he presented sufficient evidence for a reasonable jury to find a causal connection between his protected conduct and his increased security level but

not the officials' misconduct charges. The causation analysis in retaliation claims employs a two-step burden-shifting framework. *See Thaddeus-X*, 175 F.3d at 399. King must first establish "that his protected conduct was a motivating factor behind any harm." *Id*. The burden then shifts to the officials to "show that [they] would have taken the same action in the absence of protected activity." *Id*. If the officials make such a showing, they prevail on summary judgment. *Id.* In this case, there is a genuine issue of material fact whether the officials would have increased King's security level if King had not participated in his protected activities. But no genuine issue of fact exists regarding retaliation by false misconduct charges because King produced no evidence that his protected conduct was the motivating factor for the officials' charges.

> *a. King created an issue of material fact as to whether the officials increased his security level in retaliation for his participation in protected activity.*

Summary judgment for the officials was not proper as to King's claim that they increased his security level in retaliation for his participation in protected activity because (1) King has satisfied his burden that the officials increased his security level from level II to level III as retaliation for his participation in protected conduct, and (2) the officials have failed to produce sufficient evidence that they would have taken the same action in the absence of his protected activity. King has offered evidence that, soon after the officials requested King's transfer, Defendant Chaffee noted that King was "manageable in level II/remain in level II." Complaint Exhibit G. The paperwork was subsequently changed to reflect a security level of III with a note that "prisoner manipulates other prisoners to be disruptive/needs high level of security." Complaint Exhibit M. The documents were backdated and signed by Defendants Berghuis and Singleton and

then forwarded to Defendant Swift. Complaint 6-7. King offers the aforementioned June 14, 2000, emails sent between Defendants Zamiara and Berghuis that request the alterations and can reasonably imply that the alterations were requested because King was involved in the *Cain* class action. *See* Complaint Exhibit K. With these emails and other paperwork, King has satisfied his burden of producing sufficient evidence to create a genuine issue of material fact as to whether the officials increased his security level, at least in part, for his participation in protected activities.

The officials fail to meet their burden of producing evidence that they would have increased King's security in the absence of his participation in protected activity because they have provided only their own unsupported assertions as evidence that King was disruptive. The officials claimed in the lower court that they did not request the transfer with an increased security level for purposes of retaliation but rather "because [King] was perceived as a disruptive prisoner who was manipulating others to create unrest at [Brooks], and approved for transfer to [Chippewa] level III for the purpose of providing closer supervision." Zamiara Affidavit, ¶ 9. The only evidence introduced to substantiate the officials' claims, other than their own uncorroborated assertions upon which the magistrate relied,[4] was a Notice of Intent that was issued to King on September 24, six days after King had arrived at Brooks and approximately eight months before officials increased his

---

[4]Although the magistrate relied on declarations that King had "demonstrate[d] against personal clothing policy changes," *see* Magistrate's Report and Recommendation 15-16, a neutral hearing officer exonerated King of those allegations. *See* Complaint Exhibit E. Defendant Bolden also declared that King had been implicated in "two attempted escape plots" in 1989. *See* Magistrate's Report and Recommendation 15. Yet, King's complicity does not explain why he became a security risk only ten years later and after the officials' request for transfer at security level II was denied.

security level. The officials have produced no evidence of any other notices during the eight months King remained at Brooks, including any notices issued during the time between the denial of the officials' original transfer request at level II and King's subsequent transfer at level III.

Moreover, the magistrate ignored the March 15, 2002, report of the Legislative Ombudsman, who routinely decides prisoner claims and found that "[t]here appears to be no evidence that Mr. King was engaged in prohibited activities at Brooks, otherwise he would surely have been cited with a major misconduct or Notice of Intent." Complaint Exhibit S. The Ombudsman also noted, "[Mr. Zamiara's] directions to depart Mr. King to level 3 and his subsequent directions to Warden Berghuis to change Mr. King's security classification screen has the appearance of punishing Mr. King for involvement in an unpopular lawsuit against the Defendant. . . . [T]he record gives the distinct impression that his increase in custody was done for discussing issues with other prisoners, which may have prompted them to file grievances or complaints with the [Brooks] administration. No other explanation of how Mr. King manipulated other prisoners to create unrest at [Brooks] was provided in his grievance responses or elsewhere documented in his records." Complaint Exhibit S. In light of King's evidence and the neutral Ombudsman's findings, the magistrate could have granted summary judgment to the officials only by impermissibly deeming the officials credible and discounting King's contrary evidence. King has produced a genuine issue of material fact regarding the circumstances of his increased security level, and the officials' unsupported assertions are insufficient evidence for a trial court to find that no reasonable jury could find in King's favor.

*b. King creates no genuine issue of material fact as to whether his protected conduct was the motivating factor for the officials' charges of misconduct.*

However, King cannot withstand summary judgment as to his retaliation claims based on the misconduct charges because he has failed to offer any evidence that his protected conduct motivated the officials to bring charges. As to the charge that King was "out of place," the hearing officer found King not guilty because, although King was placed on toplock when he was seen returning to his cell, King may not have realized his status at that time. *See* Complaint Exhibit D. Since King was on toplock at the time of the charge, the evidence that King proffers demonstrates that the ticketing officer had reason to believe that King was violating the rules when she filed her charge. He offers no evidence of any retaliatory motive.

King has also failed to proffer any evidence that the charge of "creating a disturbance" was related to his protected conduct. Although the hearing officer found "evident inconsistencies" in Defendant Lewis' statements, which indicated "some bias on [her] part," Complaint Exhibit E, the hearing officer's findings in no way create any evidence of why Defendant Lewis falsely accused him. Because King has not demonstrated a causal connection between his litigation activities and the allegations of misconduct, summary judgment was proper as to these claims.

*C. King did not preserve his due process and conspiracy claims.*

King did not object to the magistrate's recommendation to grant the officials summary judgment on the due process and conspiracy claims. "[O]nly those specific objections to the magistrate's report made to the district court will be preserved for appellate review; making some objections but failing to raise others will not preserve all the objections a party may have." *Smith*

*v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987). Because King did not object to the magistrate's findings, we decline his invitation to review these claims on appeal.

### III. Conclusion

We reverse the district court's grant of summary judgment as to King's claim that the officials increased his security level as retaliation for his participation in the *Cain* class action and for his assistance to other inmates. We remand only this claim for other proceedings consistent with this opinion. We affirm the district court's grant of summary judgment in all other respects.