*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0146p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

KEVIN KING,

    *Plaintiff-Appellant,*

  *v.*

No. 09-2469

CHUCK ZAMIARA, CURTIS CHAFFEE, SHARON
WELLS, MICHAEL SINGLETON, and MARY
BERGHUIS,

    *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Kalamazoo.
No. 02-00141—Robert Holmes Bell, District Judge.

Decided and Filed:  May 22, 2012

Before:  MOORE and COLE, Circuit Judges; BECKWITH, District Judge.[*]

_____

### COUNSEL

**ON BRIEF:**  Kevin Himebaugh, OFFICE OF THE MICHIGAN ATTORNEY
GENERAL, Lansing, Michigan, for Appellees.  Kevin King, Jackson, Michigan, pro se.

   MOORE, J., delivered the opinion of the court in which COLE, J., joined.
BECKWITH, D. J. (pp. 36–39), delivered a separate opinion concurring in part and
dissenting  in part.

_____

### OPINION

_____

   KAREN NELSON MOORE, Circuit Judge.  Kevin King is an inmate with the

Michigan Department of Corrections ("MDOC").  In 2002, King sued several MDOC

_____
[*]The Honorable Sandra S. Beckwith, Senior United States District Judge for the Southern District
of Ohio, sitting by designation.

employees under 42 U.S.C. § 1983 for violating his First Amendment rights when they transferred him from the Brooks Correctional Facility ("Brooks"), a Level II security facility, to the Chippewa Correctional Facility ("Chippewa"), a Level III facility, in May of 2000. King claims that the increased security level and corresponding transfer were acts of retaliation committed against him for his participation in *Cain v. Michigan Department of Corrections*, Michigan Court of Claims Nos. 88-61119-AZ, 93-14975-CM, 96-16341-CM, a state-court class action regarding inmate property, as well as for his assistance to other inmates in filing grievances. Following our decisions in two prior appeals, the district court has previously held that (1) King's participation in *Cain* and his assistance to other inmates in filing grievances are protected activities, and (2) the increase in his security level—though not the transfer itself—was an adverse action. The district court held a bench trial on the sole remaining issue, whether King's protected activities caused the adverse action, and found in favor of the defendants. King appeals this ruling pro se. For the following reasons, we **AFFIRM** the district court's judgment in favor of defendants Singleton and Berghuis, but we **REVERSE** the district court's judgment with respect to defendants Wells, Chaffee, and Zamiara and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

Kevin King has been an inmate at the MDOC since he was incarcerated for first-degree murder in 1983. On September 17, 1999, the MDOC first transferred King to Brooks from Saginaw. His transfer order indicated that the transfer was requested on "suspicion" that King was a "vocal participant" in organizing a protest over personal property issues[1] and that the transfer was to separate suspected participants. *King v. Zamiara*, No. 4:02-CV-141, 2009 WL 3424221, at *1 (W.D. Mich. Oct. 20, 2009)

---

[1] "Personal property issues" generally is a reference to the same issues litigated in *Cain*. *Cain* was a state-court class action filed by a group of prisoners in 1988 to challenge new MDOC policies regulating personal property. *King IV*, 2009 WL 3424221, at *1. King was actively involved in the *Cain* litigation and spoke regularly with the attorneys and the court monitor in that case, although he was not one of the named class plaintiffs. *Id.*; R. 171 (Trial Tr. I at 23:9-25:2).

(*"King IV"*) (quoting R. 130-4, Ex. 31 (Saginaw Transfer Order)).[2] Both the Brooks and Saginaw facilities were Level II facilities, which is the second lowest security level offered by the MDOC, and King does not challenge this transfer.

Seven days after his arrival at Brooks, Sandra Naves (now Sandra Galiton, herein "Naves") issued King a Notice of Intent ("NOI") to classify him to segregation, which is an alternative to a misconduct ticket but similarly requires a hearing. The purported basis was that "'it is believed that prisoner King is attempting to incite a demonstration amongst the prisoners.'" *King IV*, 2009 WL 3424221, at *1 (quoting R.130-4, Ex. 27 (Naves NOI)). At trial, Naves testified that she was not responsible for supervising King's unit at the time of the alleged incident, she did not investigate the factual basis of the NOI, and she had no personal knowledge that King was attempting to incite a demonstration. R. 172 (Trial Tr. II at 197:8-198:20). She wrote the ticket because her supervisor, Sharon Wells,[3] asked her to and told her what to put in the NOI. *Id.* When Naves told Wells that she "had a problem" writing a ticket when she "didn't have any personal knowledge about" the underlying events, Naves testified that Wells told her to write it anyway. *Id.* at 198:21-199:5.[4] Naves's credibility was not challenged.

King never had a hearing on the NOI because on September 27, 2009, he was transferred to another Level II facility for hernia surgery. *King IV*, 2009 WL 3424221, at *2. King's transfer order for surgery indicated that he had been transferred out of Saginaw "due to his attempts to organize a demonstration" there, and that "[s]ince his arrival at [Brooks] he has attempted to do the same," R. 130-4, Ex. 32 (Surgery Transfer Order), but referenced only the recent NOI issued by Naves.

King returned to Brooks on November 10, 1999. Two days later, he wrote a letter to Mary Berghuis, the Warden of Brooks at the time, complaining about his

---

[2]Because the trial exhibits were not made available on appeal, we cite the record on summary judgment to identify the relevant documents used by both parties at trial.

[3]Sharon Wells was the Resident Unit Manager of the Conklin Unit at Brooks, where King was housed upon his arrival at Brooks.

[4]Wells testified that she did not recall instructing Naves what to put in the NOI. R. 172 (Trial Tr. II at 191:1-21).

treatment and the monitoring of his phone calls in violation of *Cain*. *King IV*, 2009 WL 3424221, at *2. He added, "Frankly, I don't like your facility at all. Your staff rival [sic] in abusing their authority and feel they don't have to answer to anyone. I've watched them provide [sic] situations and retaliate against those who remotely stand up for themselves." *Id.* (quoting R. 130-2, Ex. 3 (King/Berghuis Letter)). Sometime in early 2000, King became the Chairman of the Warden's Forum, a position elected by the other prisoners to serve as their representative in meetings with Warden Berghuis. R. 172 (Trial Tr. II at 224:25-225:25); *see also* R. 11-2, Ex. 8 (Prisoner Representative Policy).

On February 19, 2000, King was issued a ticket[5] for being out of place—a major misconduct violation—in violation of a toplock order imposed by Wells a few days before. *See King IV*, 2009 WL 3424221, at *2 (citing R. 1-5, Ex. D (Misconduct Hr'g Report)); *see also King v. Zamiara*, 150 F. App'x 485, 487-88 (6th Cir. 2005) ("*King I*") (unpublished opinion).[6] This ticket was subject to administrative review. On review, King was found not guilty of the charge, because Wells had previously told King that toplock would start at midnight, and he was cited for being out of place in the afternoon. R. 1-5, Ex. D (Misconduct Hr'g Report); *King I*, 150 F. App'x at 487-88.

On March 31, 2000, Bonnie Lewis, another Corrections Officer, wrote King a major misconduct ticket for "Creating a Disturbance." *King IV*, 2009 WL 3424221, at *2. Officer Lewis indicated that while she was instructing several prisoners at the officers' station regarding new clothing rules, the prisoners started to argue and King became disruptive. R. 130-4, Ex. 29 (Misconduct Hr'g Report). However, Assistant Deputy Warden Michael Singleton reported to the hearing officer that he spoke to Lewis and she had retracted her statement. Lewis testified at trial that she did not remember the incident in question or whether Wells had asked her to write the ticket. R. 172 (Trial

---

[5]The record does not clearly indicate who issued the misconduct ticket. The district court found that Wells issued the major misconduct ticket. *King IV*, 2009 WL 3424221, at *2. King testified that Wells instituted the toplock order, but that the citation for being out of place was issued by a different officer at Wells's behest. *King I*, 150 F. App'x at 487.

[6]"Toplock" is a restriction placed on prisoners requiring them to remain in their cell with limited periods of release. *King I*, 150 F. App'x at 488.

Tr. II at 205:13-14). Lewis was impeached with her deposition, however, where she testified, "I must have been asked to write the statement, I guess. I must have went to the RUM [Sharon Wells], I guess, and talked to the RUM and was asked to write a statement." *Id.* at 206:1-3 (quoting her deposition). Lewis did not cite any of the other seven prisoners for misconduct relating to that incident, only King. *Id.* at 206:25-207:5. The hearing officer, whose credibility was not challenged, found King not guilty on April 17, 2000. The officer found Lewis's testimony to be inconsistent and that it was "in some respects personal,"[7] and he "therefore [did] not find the reporter credible as to this prisoner's involvement." R. 130, Ex. 29 (Misconduct Hr'g Report).

Three days after the ticket was reversed, on April 20, Wells requested King be removed from her unit in a letter to Deputy Warden Shirlee Harry:

> I am requesting that this prisoner be removed from Conklin Unit. He is becoming increasingly more powerful in the eyes of the prisoners in Conklin Unit. He has made the statement to a unit officer that "these guys in the unit will do what ever I ask" "If I wanted to cause a disturbance I could anytime." Prisoners have also approached me on several occasions with different types of request and when refused they will either state that "they will get someone who will take [care] of it" and when the grievance is written it is more often than not written by prisoner King or they will state that they will make sure "King knows about this." The most recent situation, in where King was found not guilty of Creating a Disturbance, has boosted King's status in the unit with the prisoners. I believe it should be considered a security risk to the unit officers when prisoner King's authority over other prisoners is higher then the officers working in the unit. I have attached other examples of his behavior to this report. I am asking for permission to move him on the next move day, 4-26-00.

R. 11-2, Ex. F (Wells Memo) (mistakes in original); *see also King IV*, 2009 WL 3424221, at *2. At trial, Wells could not recall what officer made those statements to her, *see* R. 172 (Trial Tr. II at 189:24-190:12), and none of the referenced attachments

---

[7]The hearing officer also observed that many of Lewis's statements related to "after-occurring situations" that he "found not relevant" to the instant offense. R. 130-4, Ex. 29 (Misconduct Hr'g Report). Lewis had submitted two affidavits in support of the ticket in which she complained that King would watch the officer's station for hours at a time, or pretend to be on the phone to listen in on officer conversations. *Id.*

were ever identified by any witness. She also testified that she meant for King to be moved to another unit within Brooks, not another facility. *Id.* at 193:16-18.

The next documented MDOC action is an email from Curtis Chaffee, the transfer coordinator at Brooks, to Chuck Zamiara, a classification specialist at the MDOC Central Office in Lansing ("Central Office"), indicating that "Deputy Harry has asked for this prisoner to be transferred to an alternate Level II." R. 130-3, Ex. 18 (Chaffee/Zamiara Email). Chaffee added:

> The reason for this request is that he has been at [Brooks] for 6 months during this time, he has developed a cadre of followers over whom he has substantial influence. It seems he can instigate them to create problems (grievances, complaints to Warden's Forum, etc.) while he remains uninvolved directly. Currently, he is printing out grievances about various issues and having other prisoners sign them and send them in. Deputy Harry has asked for a "break" from prisoner King and would accept him back after a period of time.

*Id.* Chaffee testified that he believed the specific examples of the "problems" King was creating—filing grievances and complaints to the Warden's Forum—came from Harry. Had Harry mentioned other forms of misconduct, Chaffee testified that he would have included them. R. 171 (Trial Tr. I at 141:4-21). Chaffee also testified that were it not for King's participation in the filing of grievances and the Warden's Forum, he did not believe King would have been transferred at all. *Id.* at 142:13-16. Harry confirmed these statements, testifying that the only behavioral issues she was aware of were that King was filing grievances and making complaints to the Warden's Forum. *Id.* at 120:23-121:1. She did not think he was being manipulative or causing other disruptions. *Id.* at 127:14-128:2.

Zamiara responded forty minutes later to Chaffee saying, "Let's send him to URF as a level III, note in the departure, prisoner is preceived [sic] as a disruptive prisoner who is manipulating others to create unrest at LRF." *King IV*, 2009 WL 3424221, at *4 (quoting R. 130-3, Ex. 18 (Chaffee/Zamiara Email)). A "level III" is a more heightened security facility with greater restrictions on a prisoner's movement and access to

telephone calls.  *King IV*, 2009 WL 3424221, at \*6.  Because King was on a hold list,[8] Zamiara had to obtain approval from Classification Director Nick Ludwick before approving the transfer.  After the two discussed the matter, "the decision was made that [King] should be transferred to Level III."  *King IV*, 2009 WL 3424221, at \*4.

Chaffee admitted that he completed the required security screen review to effectuate the transfer for King prior to contacting Zamiara on May 8, 2000.  R. 171 (Trial Tr. I at 135:12-136:12; 146:12-21).  Chaffee initially indicated a transfer to a Level II facility in Carson City ("DRF") and wrote in that King was "manageable in Level II / Remain in Level II."  *King IV*, 2009 WL 3424221, at \*3 (citing R. 130-3, Ex. 16 (Chaffee Screen)).  Upon receiving Zamiara's email, Chaffee admitted that he went back to this exact screen and revised it by hand to say "URF" instead of "DRF" and scored King at a Level III instead of a Level II.  *King IV*, 2009 WL 3424221, at \*4; R. 171 (Trial Tr. I at 140:3-11).  The review was signed as "approved by Wells."  R. 130-3, Ex. 16 (Chaffee Screen).

On May 12, Chaffee and Berghuis signed the transfer order sending King to Chippewa, a Level III facility.  *King IV*, 2009 WL 3424221, at \*4 (citing R. 130-3, Ex. 26 (Transfer Order)).  The stated reason was:  "Prisoner manipulates other prisoners to be disruptive."  *Id.*  The transfer order also indicates that the transfer was approved by Central Office "Per email by C. Zamiara 05/08/00."  R. 130-3, Ex. 26 (Transfer Order).  King was transferred May 17, 2000.

A month later, on June 14, Zamiara sent an email directly to Berghuis.  *King IV*, 2009 WL 3424221, at \*4.  Zamiara told Berghuis that Peter Govorchin, who was the attorney handling the *Cain* case for the state, was concerned that "the issue of retaliation" may be raised over the fact that King's transfer documents were edited by hand.  R. 130-3, Ex. 20 (Zamiara/Berghuis Email).  Zamiara asked Berghuis to have her staff "re-do these and indicate that transfer to URF level III and the one level departure

---

[8]King was on the hold list because in 1990 he received a major misconduct ticket due to allegations by another inmate of a potential escape attempt; King was found not guilty of the ticket, but was never removed from the hold list.  *King IV*, 2009 WL 3424221, at \*4.

was done because Prisoner King is perceived as a disruptive prisoner who is manipulating others to create unrest at LRF." *Id.* Zamiara ended his email with a prescient warning: "Mr. Govorchin also ask [sic] that I advise you that staff from LRF may be called to court to answer questions concerning Prisoner King's transfer to URF." *Id.* Chaffee remembered being "chewed out" by Warden Berghuis over the screen, R. 171 (Trial Tr. I at 133:11-19) (citing R. 130, Ex. 7 (Chaffee Dep. Tr. at 15:1-3)), and that Warden Berghuis then told him to prepare a new screen to replace the old one. R. 171 (Trial Tr. I at 147:24-148:3; 149:7-11). The new screen stated "Prisoner manipulates other prisoners to be disruptive/needs higher level of security," in place of "Manageable in Level II/Remain in Level II," and was backdated to May 8, 2000. Michael Singleton signed and approved the new screen. At trial, Singleton stated that he had no idea it had been backdated at the time. R. 172 (Trial Tr. II at 212:13-14).

While at Chippewa, King continued to object to various people, including Zamiara, regarding his Level III placement, all of whom responded with references to the prior statements regarding his ability to manipulate other prisoners. *King IV*, 2009 WL 3424221, at *4. In February, 2001, King was approved for a transfer to Thumb Correctional Facility at a Level II and sent there shortly thereafter. *Id.* Although not always at the same facility, King has subsequently remained at a Level II.

## II. PROCEDURAL HISTORY

On July 26, 2002, King filed a pro se complaint in the United States District Court for the Western District of Michigan alleging First Amendment retaliation against eight MDOC employees: Chuck Zamiara, Curtis Chaffee, Bonnie Lewis, Sharon Wells, Michael Singleton, Mary Berghuis, Terry Swift, and Dan Bolden.[9] All eight defendants moved for summary judgment on April 1, 2003, which the district court granted, concluding that King had not engaged in any form of protected conduct, and that even if he had, none of the three purported acts in retaliation were motivated by the conduct. R. 30 (Dist. Ct. Order at 1).

---

[9]King alleged much more, but this is all that is relevant for our purposes.

King timely appealed to this court, and we reversed. *King I*, 150 F. App'x at 497. We held that summary judgment for the defendants was inappropriate because King made a sufficient prima facie showing that his participation in the *Cain* class-action lawsuit and his legal assistance to other inmates in filing grievances both constituted protected conduct under the First Amendment. *Id.* at 491-93. We also held that King had produced sufficient evidence that the defendants took "adverse" actions against him when they charged him with the various misconduct tickets and increased his security level, but not by the act of transferring him from one facility to another. King also provided sufficient evidence of a causal connection between the increase in security and the protected conduct, although not the misconduct tickets. We then remanded the case to the district court for a determination in the first instance of whether increasing an inmate's security level in retaliation for engaging in protected conduct would constitute a "clearly established" constitutional violation in May 2000 so as to preclude qualified immunity. *Id.* at 491 n.3.

On remand, the Magistrate Judge recommended denying the motion to dismiss on the basis of qualified immunity because the facts taken in the light most favorable to King demonstrated a constitutional violation based on retaliatory conduct, and such retaliation was a violation of "clearly established" constitutional law as set forth in *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). R. 57 (Mag. R&R at 5, 7). The district court disagreed and granted the defendants' motion. *King v. Zamiara*, No. 4:02-cv-141, 2006 WL 2439732, at *1 (W.D. Mich. Aug. 22, 2006) ("*King II*"). Again, King timely appealed.

We again reversed the district court and held the officials were not entitled to qualified immunity. *King v. Zamiara*, No. 06-2271, slip op. at 4 (6th Cir. April 26, 2007) ("*King III*"). We held that the absence of a case dealing directly with the adverse action in question—here, increasing a security level—was not the proper inquiry because "the law was clear in May 2000 that prison officials could not retaliate against prisoners for participation in these activities . . . ." *Id.* at 4-5. The case was again remanded for further proceedings.

On remand, both parties moved for summary judgment. The district court granted the defendants' motion in part, agreeing that King had not shown sufficient evidence of three of the defendants' roles to maintain liability against them.[10] The district court also granted King's motion in part, ruling on both of the elements that we had previously held survived summary judgment: King's conduct was in fact protected and the subsequent increase in his security did constitute an adverse action. The remainder of both parties' motions were denied, and the case proceeded to trial solely on the question of causation. King was eventually appointed counsel.

At trial, King called twelve witnesses, including himself and all five defendants. Excerpts of the deposition testimony of several witnesses were also entered as trial testimony. The defendants called no witnesses. Following the two-day trial, the district court issued its opinion finding in favor of the defendants. *King IV*, 2009 WL 3424221, at *9. King now appeals pro se.

## III.  RETALIATION CLAIM

**A.  Standard of Review and Analytical Framework**

Following a bench trial, we review de novo the district court's conclusions of law. *Woolsey v. Hunt*, 932 F.2d 555, 563 (6th Cir.), *cert. denied*, 502 U.S. 867 (1991). We review the district court's findings of fact, however, for clear error. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). In assessing for clear error, "the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52 (a)(6). A district court has committed clear error only when "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson*, 470 U.S. at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). If the district court's account is "plausible in light of the record viewed in its entirety, the court of appeals may not reverse." *Id.* at 574. We cannot find that the district court committed clear

---

[10]Defendants Bolden, Swift, and Lewis were thereafter dismissed from the case, a decision King did not appeal.

error "[w]here there are two permissible views of the evidence," *id.*, even if we would have weighed the evidence differently, *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 556 (6th Cir. 2010).

To state a claim for relief under § 1983 for a First Amendment retaliation claim, a plaintiff must show that:

(1)  the plaintiff engaged in protected conduct;
(2)  an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and
(3)  there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X*, 175 F.3d at 394.

Because of the prior rulings, the only issue at trial was the third element—whether there was a causal connection between the increase in King's security level and his participation in the *Cain* litigation or his assistance in the filing of grievances.  King bore the burden of establishing by a preponderance of the evidence that his reclassification was motivated at least in part by King's protected conduct.  *Id.* at 399.  Upon such a showing, the defendant must "show[] by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 n.1 (6th Cir.) ("[I]n a First Amendment retaliation case, once a plaintiff shows that her constitutionally protected conduct was a substantial factor in an adverse employment decision, the burden of persuasion shifts to the defendant."), *cert. denied*, 531 U.S. 875 (2000).

**B.  Establishing Causation in a Retaliation Claim**

Protected speech does not *cause* an adverse action in the traditional sense because protected speech does not act, but we say protected speech causes an adverse action if the speech motivates an individual actor to take acts that then proximately cause an adverse action.  Subjective motivation appropriately enters the picture on a retaliation

claim because our concern is with actions by public officials taken with the intent to deter the rights to free expression guaranteed under the First Amendment. *Bloch v. Ribar*, 156 F.3d 673, 681-82 (6th Cir. 1998) ("[A]n act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.") (internal quotation marks omitted). Thus, causation in retaliatory claims may really be considered a two-part inquiry: A plaintiff must show both (1) that the adverse action was proximately caused by an individual defendant's acts, *Siggers-El v. Barlow*, 412 F.3d 693, 702 (6th Cir. 2005), but also (2) that the individual taking those acts was "motivated in substantial part by a desire to punish an individual for exercise of a constitutional right," *Thaddeus-X*, 175 F.3d at 386.

"Causation in the constitutional sense is no different from causation in the common law sense." *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005) (citing *Malley v. Briggs*, 475 U.S. 335, 345 n.7 (1986)), *cert. denied*, 546 U.S. 1090 (2006). An officer may therefore be liable under § 1983 "'for the natural consequences of his actions.'" *Id.* (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). This includes liability for acts giving rise to the ultimate harm, even if the harm is executed by someone else. *Powers v. Hamilton Cnty. Pub. Defenders Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007) ("Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable."), *cert. denied*, 555 U.S. 813 (2008); *see also Paige v. Coyner*, 614 F.3d 273, 281-82 (6th Cir. 2010) (holding state actor could be liable for retaliation for making false statements to plaintiff's employer causing her to be fired); *Sykes v. Anderson*, 625 F.3d 294, 311-12 (6th Cir. 2010) (rejecting argument that officers could not be liable for malicious prosecution because they did not "make" the decision to prosecute).

The district court found that four of the five defendants—Wells, Chaffee, Singleton, and Berghuis—could not be liable for retaliation because they were not "involved" in the decision to increase King's security level. *King IV*, 2009 WL

3424221, at *8.  The district court's use of the word "involved," however, erroneously focused solely on who made the ultimate decision to increase King's security, not whether any of the defendants' actions were the proximate cause of the increase in security.  The district court failed to acknowledge that a person who sets in motion an adverse action can be liable for retaliation for the reasonably foreseeable consequences of his actions.  *Siggers-El*, 412 F.3d at 702.

That brings us to motive.  Motive is often very difficult to prove with direct evidence in retaliation cases.  *Bloch*, 156 F.3d at 682-83.  Circumstantial evidence may therefore acceptably be the only means of establishing the connection between a defendant's actions and the plaintiff's protected conduct.  We have previously considered the temporal proximity between protected conduct and retaliatory acts as creating an inference of retaliatory motive.  *Paige*, 614 F.3d at 282-83; *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) ("[T]emporal proximity alone may be significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.") (internal quotation marks omitted).

The defendants urge us to hold that the plaintiff must show an intent to achieve the specific adverse action—here, the increase in security level—and not just a general intent to retaliate for the protected speech.  We decline to do so.  Under such an approach, the corrections officer who wanted to punish an inmate for filing complaints against her could write a letter to her superior demanding a transfer for false allegations of violence, and under the defendants' view, she would be liable only if the inmate was then transferred, not if her superior decided to place the inmate in solitary confinement as a result of the officer's letter.  The officer could guarantee escaping liability entirely by requesting no specific action at all, knowing full well the likely result of her letter labeling the inmate a "security risk" would be some sort of punitive act against the inmate and intending some form of punishment to occur.  Such a standard would permit those with the necessary intent to retaliate to escape liability for setting in motion a punitive act ultimately executed by someone else.

The district court found all five of the defendants could not be liable because they were motivated to take action against King not because of his protected activities but because "he was using his influence over other prisoners to create problems and was undermining the authority of prison officials." *King IV*, 2009 WL 3424221, at *9. The district court's finding with respect to the defendants' motivation is a finding of fact to which we afford deference.

## C.  Alternative Theories of Liability in a Retaliation Claim

There are two other possible paths for holding someone liable for retaliation relevant in this context:  subordinate liability and supervisory liability.  Individuals who aid in the implementation of an adverse action at the instructions of a superior will be liable along with their superior if they knew or should have known that the adverse action was unlawful.  *Thaddeus-X*, 175 F.3d at 393 ("[R]ejecting prison officers' argument that 'since they did not have the authority to alter the [prisoner's security] classification, any consequence of that status cannot be their responsibility.'" (quoting *Villanueva v. George*, 659 F.2d 851, 854 (8th Cir. 1981) (en banc))).  Because this stems from principles of agency, the plaintiff must establish that the superior intended to retaliate but only that the subordinate knowingly participated in the acts of the superior. *Thaddeus-X*, 175 F.3d at 393 (holding a subordinate's knowing participation in a superior's retaliatory conduct sufficient to give rise to liability of subordinate who merely executed the unlawful orders).

Superiors and supervisors, on the other hand, are generally not liable for the acts of those whom they oversee.  "Respondeat superior is not a proper basis for liability under § 1983." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006). Superiors may be liable, but only if they "'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Id.* (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000)).  Having the right to control the offending employee is not enough, simply being aware of the misconduct is not enough, and even administrative approval of an action later found to be retaliatory, without more, is not enough. *Id.*; *see also Siggers v. Campbell*, 652 F. 3d

681, 695 (6th Cir. 2011) (granting summary judgment for warden who merely approved notices filed against the inmate). The supervisor must be said to have "directly participated, encouraged, authorized or acquiesced in the claimed retaliatory acts" to be liable under § 1983. *Shehee*, 199 F.3d at 300.

Against this legal backdrop, we turn now to examining the acts and motivations of each of the named defendants.

**D. Liability of Named Defendants**

**1. Deputy Warden Sharon Wells**

Wells took numerous actions in this case, none of which are really in dispute. Of greatest relevance are the two acts that may give rise to liability against her: (1) Wells sent a memo to Deputy Warden Shirlee Harry on April 20, 2000 ("Wells Memo"), to complain about King's behavior, and (2) following communication from Central Office, Wells signed the initial security screen that increased King to a Level III. Wells would be liable for the first action if she intended to punish King for his protected conduct and the security increase was a reasonably foreseeable consequence of her memo. *Siggers-El*, 412 F.3d at 702. She would be liable for the latter action if, as a subordinate, she knew or should have known that she was implementing an order motivated by a desire to retaliate for participation in protected conduct, *Thaddeus-X*, 175 F.3d at 393, or as a superior if her signature constituted active participation in the unconstitutional act of increasing his security level for retaliatory purposes, *Shehee*, 199 F.3d at 300.

**a. Sending Internal Memo**

The Wells Memo was the initial step in a chain of communications that undeniably resulted in King's security increase and transfer to Chippewa. After receiving the Wells Memo, Deputy Warden Harry instructed a subordinate, Chaffee, to email Central Office and request a transfer. There is no evidence on the record of any other information in the possession of Harry or Chaffee that could have motivated their communications to Central Office. Harry testified at trial that aside from the two

examples listed in Chaffee's email, the filing of grievances and the complaints to the Warden's Forum, she was not aware of King causing any other problems during his tenure at Brooks.  R. 171 (Trial Tr. I at 120:23-121:1).  Chaffee testified that he had no personal knowledge of King's behavior and was told to initiate the transfer because King was instigating other prisoners to file grievances.  *Id.* at 139:9-13.  The substance of the complaint in Chaffee's email is also the same as the Wells Memo—King has gained influence over other prisoners and is having them file numerous grievances.  Zamiara from Central Office, after being confronted with his own deposition testimony, admitted at trial to having no other information outside of what was in Chaffee's email that could have motivated the decision to increase King's security level.  *See* R. 172 (Trial Tr. II at 166:19-167:20).  The only reasonable conclusion from the record is that the Wells Memo was a "but for" cause of the increase in King's security.

The Wells Memo was also a proximate cause of the adverse action, because an adverse action, such as increasing King's security, was a reasonably foreseeable consequence of sending the memo.  In *Siggers-El*, we held that a prison guard who fills out a security screen cannot disentangle herself from the resulting adverse action even though it was approved and ordered by other people.  *Siggers-El*, 412 F.3d at 702.  Although unforeseeable consequences would not give rise to liability, such as an attack on the prisoner following the transfer, the guard could not absolve herself of liability by arguing that she did not take part in or have control over the adverse action.  *Id.*  Here, there are admittedly more steps between Wells's actions and the resulting harm than there were for the defendant in *Siggers-El*.  The Wells Memo was not sent directly to Central Office, but traveled first to Wells's Deputy Warden.  Wells nominally asked for a transfer.  However, an adverse action was nonetheless a reasonably foreseeable

consequence of the allegations in her Memo.[11] Wells's actions are not so attenuated as to absolve her of their reasonably foreseeable consequences.

The district court, faced with the same facts, "found" that Wells was not involved in the increase in King's security level based on the fact that she did not ask specifically for an increase and "had no involvement in the decision to increase his security level." *King IV*, 2009 WL 3424221, at *6. As already discussed, however, this applies the wrong legal standard. On de novo review, we conclude that the adverse action taken against King was proximately caused by the Wells Memo.

We turn now to whether Wells was motivated by a desire to punish King for his protected conduct. The district court found that Wells was motivated only by concerns over King's power over other prisoners and ability to create unrest through his abuse of the grievance process. *King IV*, 2009 WL 3424221, at *9 ("To the extent that Defendants were motivated in transferring King based upon his manipulation of other prisoners to file grievances to achieve King's own goals, they did not retaliate against him on the basis of any protected conduct."). Embedded in this conclusion is both a legal error and a factual one. The legal problem is that the district court, following analysis from this court, already concluded as a matter of law that King's assistance to

---

[11]The dissent objects to this conclusion, but makes the same error as the district court by erroneously focusing on the foreseeability of the precise adverse action that was taken, in this case an increase in security. The issue is only whether it was reasonably foreseeable that the Wells Memo would cause a punitive act to be taken against King significant enough to be classified legally as "adverse." The Wells Memo did not need to contain "code words" to signal Harry to increase King's security, nor does it matter that Harry herself was not subjectively alarmed by the words in Wells's Memo because the causal chain did not stop at Harry. We also do not agree that transfers may never be adverse actions, although we take no issue with the prior holding in this case that King's transfer was not adverse. *See Hill v. Lappin*, 630 F.3d 468, 474-75 (6th Cir. 2010) (collecting cases). Here, Wells's Memo outlined conduct allegedly undertaken by King, and it was reasonably foreseeable that an adverse action would be taken against King as a result of her Memo. That Harry read Wells's Memo and continued with the request for a transfer does not mean stronger action was not reasonably foreseeable.

The dissent commits a second error by focusing on the motive of Harry, the initial recipient of Wells's Memo, as breaking the causal chain. The dissent finds it absolutely crucial that King concedes that Harry had no retaliatory intent, but cites no case or law for the proposition that the causal chain is broken when a retaliator uses ignorant third parties to effectuate the retaliation. Indeed, as we discussed above in Section III.B., *supra*, the law is precisely the opposite. *See Powers*, 501 F.3d at 609 (holding proximate causation still exists "[e]ven if an intervening third party is the immediate trigger for the plaintiff's injury"); *Paige*, 614 F.3d at 281-82 (holding proximate causation not broken when false statements by retaliator caused innocent employer to fire plaintiff); *Sykes*, 625 F.3d at 311-12 (holding officers proximately caused malicious prosecution even though innocent party made the decision to prosecute). As we further explained, to hold otherwise would allow an officer with retaliatory intent to insulate herself entirely from liability by writing a memo with trumped up allegations requesting no action at all but intending and rightfully expecting severe consequences to follow.

other prisoners in using the grievance system was protected conduct. R. 153 (Dist. Ct. Mem. Op. & Order at 14). Abusive or manipulative use of a grievance system would not be protected conduct. *See Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (holding no First Amendment right to file frivolous grievances). Therefore, to conclude now that King was in fact manipulating the grievance system would require reversing the prior holdings in the case, which we will not do.

That brings us to the factual error. Subjective motivation requires asking whether the individual in question *believed* the defendant to be abusing the system to create unrest. The district court credited Wells's statements in her Memo that King "was becoming increasingly powerful over the prisoners" and was therefore a security risk. *King IV*, 2009 WL 3424221, at *6. "[T]he preponderance of the evidence demonstrates that King's behavior did not stop [with protected conduct], but also involved agitating other prisoners and attempting to disrupt the delicate balance of authority the MDOC must retain over prisoners in its charge." *Id.* at *9. The district court found collectively that none of the defendants, including Wells, had any animus against King or the exercise of his protected conduct. We afford this fact determination substantial deference, but on review we deem this finding to be clear error.

The record is void of any evidence—let alone a preponderance—to support Wells's claim that she subjectively believed King was abusing the grievance system or was otherwise disruptive or manipulative in any way that would entitle her to initiate punitive action against him. King was undeniably the litigious type. Aside from his participation in the *Cain* litigation, he was also involved in the filing of numerous grievances, both his own and assisting others.[12] He was also a member of the Warden's Forum. As a result, King undoubtedly had a certain level of respect and influence among the prisoners. This conduct—protected conduct—may undoubtedly create disruptions or "problems" for prison officials. But when that happens, the prison is not

---

[12]The record does not contain any evidence of the purported "shotgun" grievances that the defendants claimed were an abuse of the system. *See Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir.) (citing specific numbers of grievances the allegedly disruptive plaintiff filed), *cert. denied*, 516 U.S. 991 (1995). And as already discussed, this is consistent with the district court's legal determination that King's actions constituted protected conduct.

restricted from taking *any* action against the prisoner to minimize the disruption, it just must not take an *adverse* action against the prisoner. *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir.) (holding no constitutional violation for taking action against prisoner whose numerous grievances were disruptive because chosen action did not deter him from exercising his rights), *cert. denied*, 516 U.S. 991 (1995). "Prison officials are clearly free to punish inmate conduct that threatens the orderly administration of the prison. But . . . prison rules are not [to be] used as a backdoor means of punishing inmates for exercising their right[s]." *Brown v. Crowley*, 312 F.3d 782, 791 (6th Cir. 2002), *cert. denied*, 540 U.S. 823 (2003) (internal quotation marks omitted).

Nor was there any support for Wells's statements that King posed a security risk or was responsible for or even at risk of creating any disturbances or manipulating the other prisoners in any way. The testimony of the disinterested witnesses consistently established the contrary. The Wells Memo references examples of threats by King and purportedly attaches examples, but no such examples are attached. Nor was Deputy Warden Harry, the recipient of the Wells Memo, able to confirm the existence of any problems with King. R. 171 (Trial Tr. I at 120:23 (testimony that Harry was not aware of King causing any problems "other than what he was doing in connection with grievances and complaints to the Warden's Forum")). Warden Berghuis testified that King "has a huge ego" and was a "very difficult to manage prisoner" who "superimposes his will over the will of the department," but not even she could identify any specific manipulative or disruptive behavior. R. 172 (Trial Tr. II at 135:10-17; 237:2-238:2). None of the witnesses could identify specific examples, and many even testified that they had no knowledge of King ever manipulating others to create unrest among the other prisoners. *See* R. 171 (Trial Tr. I at 127:14-17) (Harry testimony); *id.* at 147:10-23 (Chaffee testimony); R. 172 (Trial Tr. II at 198:6-15) (Naves testimony); *id.* at 207:23-25 (Lewis testimony).[13]

---

[13]The district court credited Lewis's affidavit in support of her major misconduct ticket wherein she complained about King watching the officers and interfering with the operation of the unit, but failed to acknowledge that the hearing officer reviewing that ticket, a neutral party, did not find Lewis's account credible. *Compare King IV*, 2009 WL 3424221, at *2 *with* R. 130, Ex. 29 (Misconduct Hr'g Report).

We do not deny the general need of corrections officers to maintain order in a prison, which may require acting preemptively based on concerns that have not yet materialized. And had the testimony stopped here, a retaliatory motive would have been difficult to substantiate. But the evidence did not stop here. Although the record is silent as to disruptive behavior by King, the record speaks volumes as to repeated attempts by Wells to punish King following his arrival at Brooks as a known participant in the *Cain* litigation:

- Sandra Naves, a corrections officer at Brooks with no incentive to lie, testified that she had no personal knowledge of King ever inciting a demonstration in September 1999, and despite her concerns, was told by Wells to issue King a NOI and what to put in it. No other inmate supposedly involved in that incident was written up. R. 172 (Trial Tr. II at 197:8-199:5).

- In February, Wells herself placed King on toplock, and shortly thereafter he was cited for being in violation of the toplock, despite having no notice that it would start before midnight on the day in question. This ticket was also ultimately thrown out. R. 1-5, Ex. D (Misconduct Hr'g Report).

- Bonnie Lewis, another fellow officer at Brooks, issued King a ticket for being disruptive, despite later admitting that he was not disruptive, and conceded that Wells had asked her to write the statement. R. 172 (Trial Tr. II at 206:1-4). No other prisoners from the supposed group of seven were cited for that incident. Deputy Warden Singleton spoke to Officer Lewis and thereafter conveyed to the hearing officer that she had retracted her statements. R. 130, Ex. 29 (Misconduct Hr'g Report). The hearing officer determined that Lewis's report was not credible and found King not guilty of the ticket. *Id.*

- Three days after Lewis's ticket was thrown out, Wells formally complained to the Deputy Warden for the first time regarding King's behavior, referencing allegations by unnamed officers and purportedly attaching examples that do not appear to have been attached. R. 11-2, Ex. F (Wells Memo).

The district court made no mention of any of the above testimony of Sandra Naves, Michael Singleton, and Bonnie Lewis with respect to the purported "disturbances" created by King, nor did the district court indicate why it found their statements not credible. All three of these witnesses were MDOC employees, two of

whom were not defendants when they testified at trial, and at no point was their credibility ever challenged or questioned.  The district court also ignored the timing of when Wells sent her Memo to Harry—three days after the ticket Wells had asked Lewis to write was thrown out—which is also highly suggestive of an intent to retaliate against King.  *See Paige*, 614 F.3d at 283; *Muhammad*, 379 F. 3d at 417-18.  Instead, the district court relied on Wells's unsupported assertions at trial and in her Memo that unnamed officials had reported various degrees of unrest and violence by King and her general denial of ever taking action against King in order to retaliate against him.  Wells's inability to remember at trial several years later the events in support of her Memo is hardly proof that these events did not happen, but it also does not explain why those officers were never identified in the first place.[14]

The district court concluded that Wells was "a very credible witness," *King IV*, 2009 WL 3424221, at * 6, and we do not overturn that finding lightly.  Credibility assessments by the finder of fact in particular are owed "even greater deference" under Federal Rule of Civil Procedure 52(a).  *Anderson*, 470 U.S. at 575.  At the same time, a district court cannot "insulate his findings from review by denominating them credibility determinations," because whether a witness is believable depends on more than just her demeanor on the stand.  *Id.*  Where "[d]ocuments or objective evidence . . . contradict the witness' story; or the story itself [is] so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it[,] . . . the court of appeals may well find clear error even in a finding purportedly based on a credibility determination."  *Id.*  The district court here committed clear error when it concluded that the preponderance of the evidence supported Wells's claim that she was motivated by King's disruptiveness despite no substantiation for such disruptiveness and despite

---

[14]The district court also erroneously credited Wells's brief testimony despite her frequently inconsistent answers.  For example, when asked about the security screen she signed that bumped King to a Level III yet also said "Manageable at II," she said both that she would have paid great attention to making sure all the boxes were filled in, but that it never stood out to her as not matching up.  When her own counsel seemed surprised, her explanation made even less sense:  "I think I would have questioned it at that time, but I didn't notice it."  R. 172 (Trial Tr. II at 192:15-3).  When asked if she had any input in the decision to bump King to a Level III, she said both "I had no part of that," and then "I don't remember."  *Id*. at 194:5-7.

repeated contradictory testimony by other MDOC officers that Wells instructed them to write King up for incidents later found not credible by neutral parties.

Rare is the case where a defendant testifies on the record that she intended to retaliate against a prisoner for exercising his constitutional rights. Here, however, the district court's finding regarding Wells's motivation was wholly unsupported by the record evidence; more problematically, this finding was specifically contradicted by uncontested documents and testimony from neutral parties establishing Wells's retaliatory motive. We are left with the firm impression that on this evidence the district court committed clear error in finding that Wells's actions were not motivated "at least in part" by King's protected conduct.

### b. Signing Security Screen

Wells was also involved in the implementation of the adverse action against King. Upon receiving the instructions from Central Office to increase King's security, Chaffee edited the initial screen by hand to replace the II with a III and Wells signed the screen. The only relevant question for this act of implementing the order is whether Wells knew or should she have known that implementing Central Office's orders would violate King's rights. *See Thaddeus-X*, 175 F.3d at 393. Because Wells was the one who put in motion the adverse action in the first place out of a desire to punish King, we have no difficulty concluding that she helped execute the order with knowledge that it was intended to retaliate. We therefore find it unnecessary to consider whether Wells should alternatively be viewed as a superior for this action.

### c. Conclusion

The judgment in favor of Wells must be reversed because the district court committed both an error of law and a clear error of fact. The district court first erred in applying the wrong legal standard to the issue of whether Wells caused the adverse action against King in this case. When the correct legal standard is applied to the facts as determined by the district court, Wells's Memo was the actual and proximate cause of the increase in King's security level. Although we afford the district court's findings

substantial deference, we cannot affirm the district court's finding that Wells was not motivated at least in part by King's protected conduct when sending this Memo. This finding is unsupported by the record evidence and directly contradicted by the undisputed record and testimony by neutral parties demonstrating her animus against King's protected activities. *See Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 601 (6th Cir.) (reversing as clear error finding of fact following bench trial that was unsupported by the record when contradictory evidence was offered in support of the opposite conclusion), *cert. denied*, 534 U.S. 994 (2001). We do not hesitate to conclude that the district court committed clear error with respect to Wells. The district court's judgment in favor of Wells is vacated, and we remand for further proceedings consistent with this opinion.

### 2. Transfer Coordinator Curtis Chaffee

Chaffee's potential involvement in increasing King's security level also came in multiple forms, none of which are factually disputed: (1) he emailed Central Office the information it ultimately relied on in making the decision to increase King's security level, (2) he implemented the decision to increase King's security level by issuing and then editing the initial security screen, and (3) he subsequently edited the screen several months later with a new reason for the increase. Just like Wells, he could be liable for the first action if an increase in security was a reasonably foreseeable consequence of his actions and proximately caused by them, and if he intended to retaliate against King for his protected conduct. *Siggers-El*, 412 F.3d at 702. Chaffee could be liable for the latter actions if he knew or should have known that implementing his superior's orders would violate King's rights. *Thaddeus-X*, 175 F.3d at 393.

### a. Email to Central Office

Just like the Wells Memo, Chaffee's email to Central office proximately and actually caused the resulting security increase by Central Office. There is no indication in the forty minutes between Zamiara's receipt of Chaffee's email and Zamiara's reply issuing the security increase that Zamiara received any additional information regarding

King.  *See* R. 172 (Trial Tr. II at 166:19-167:20).  For the same reasons discussed above in addressing the Wells Memo, we disagree with the district court's conclusion that Chaffee was not "involved" in the increased security level.  That conclusion is the result of a misapplication of the correct law to the undisputed facts giving rise to the increase in King's security level.

The next inquiry is whether the district court committed clear error in finding that Chaffee was not motivated by King's exercise of his constitutional rights.  Compared to Wells, Chaffee appears to have held no specific malice or ill-will toward King.  However, the desire to punish someone for protected conduct does not require malice.  The record clearly reflected that Chaffee was motivated at least in part by King's protected conduct, even if he did not realize that doing so would constitute retaliation.[15] We therefore take no issue with the district court's finding that Chaffee's testimony was credible, *King IV*, 2009 WL 3424221, at \*9, because Chaffee's statement that he took no action "for the purpose of retaliating against Mr. King," R. 171 (Trial Tr. I at 154:6-8), says nothing about whether Chaffee understood that the legal definition of retaliation included taking an adverse action against King in response to his protected conduct, which included assisting others in filing grievances.

Indeed, if Chaffee is credible, his testimony directly establishes that he was improperly motivated by King's protected conduct.  In his email to Zamiara, Chaffee specifically cites King's assistance with filing grievances and participation in the Warden's Forum as examples of the "problems" King was causing that required him to be transferred:  "It seems he can instigate them to create problems (grievances, complaints to Warden's Forum, etc.) while he remains uninvolved directly.  Currently, he is printing out grievances about various issues and having other prisoners sign them and send them in."   R. 130-3, Ex. 18 (Chaffee/Zamiara Email).   Chaffee also acknowledged being told that "King was being transferred because he was instigating other prisoners to file grievances."  R. 171 (Trial Tr. I at 139:9-12).  Chaffee testified

---

[15]We see no error in the district court's finding that Chaffee "did not know King, and he had no knowledge of King's involvement in the *Cain* litigation." *King IV*, 2009 WL 3424221, at \*6. Involvement in *Cain*, however, was only one of the protected activities in which King participated.

that if Harry had told him of other forms of misconduct or manipulative behavior, he would have included it in the email, and that if King had not been involved in the Warden's Forum and had not been assisting other prisoners file grievances, he likely would not have been transferred at all. *Id.* at 142:13-16.[16] An adverse action, like an increase in security, was a reasonably foreseeable consequence of Chaffee's request, and the record clearly demonstrates that King's assistance in filing grievances motivated Chaffee to comply with his superior's order requesting the transfer.[17]

### b. Initial Editing of Security Screen

With respect to implementing the increase in security, Chaffee admits making the change to King's transfer order to increase him to a level III. R. 171 (Trial Tr. I at 140:3-11). These changes were necessary to effect the transfer and increase in security ordered by Central Office. We have already held that Chaffee is not entitled to qualified immunity, *King III*, slip op. at 4, and the evidence supports that he knew or should have known that increasing a prisoner's security level in response to protected conduct would be a violation of King's First Amendment rights. The question is therefore whether he knew or should have known the increase was in fact impermissibly motivated by the protected conduct. *See Thaddeus-X*, 175 F.3d at 393.

Chaffee could not recall having any discussions with Zamiara outside of his email. R. 171 (Trial Tr. I at 146:1-5). However, only forty minutes passed between Chaffee's email and Zamiara's response. Chaffee testified that he had no reason to believe Zamiara's response to increase security was for retaliation, and that he assumed

---

[16] That Warden Harry ordered Chaffee to send the email requesting transfer does not relieve him of liability. *Thaddeus-X*, 175 F.3d at 393.

[17] The dissent makes no effort to counter these clear facts, concluding instead that there was "no evidence that Chaffee knew or should have known that [King] was not actually instigating other prisoners to defiance." Dissent Op. at 38. The dissent offers no record support for the statement that King was instigating others to "defiance," because there is no record support for that statement. Chaffee himself testified that he had no personal knowledge that King ever manipulated other prisoners to be disruptive. R. 171 (Trial Tr. I at 147:10-23) (Chaffee testimony). Instead, Chaffee had information that King was printing out grievances and making complaints to the Warden's Forum, protected First Amendment conduct, which he may have deemed disruptive. King's personal speculation that Harry did not want to retaliate against him has no legal significance as to Harry's actual intent, and even if it did, the dissent offers no support for why Harry's intent should have any bearing on Chaffee's intent.

that "[Zamiara] knew something I didn't know." R. 171 (Trial Tr. I at 156:18-25). However, this assertion is not factually plausible in light of Chaffee's other statements that are directly contrary.[18] He conceded at trial that absent a few narrow exceptions, increasing a prisoner's security level was a punitive act. *Id.* at 136:13-137:15. And he conceded at his deposition that he believed Zamiara's response was based entirely on the underlying email that he himself had sent. R. 130, Ex. 7 (Chaffee Dep. at 38:24-39:20). This is consistent with the testimony of Deputy Warden Harry that Central Office would have relied solely on information coming from Brooks regarding what action to take against King. R. 171 (Trial Tr. I at 122:6-14). The record establishes that Chaffee knew or should have known that Zamiara's rapid response of increasing King's security level was motivated by King's assistance with the grievance process, because the evidence is clear that the increase was the result of Chaffee's email, which was itself motivated by King's assistance with the grievance process.

### c. Final Editing of Security Screen

Chaffee's last relevant action was editing King's security screen to replace the initial notation with the notation that King was manipulative. Here, Chaffee was clearly following the order of a superior, Warden Berghuis, to revise the screen. R. 171 (Trial Tr. I at 147:24-148:3; 149:7-11). Unlike the forty-minute window we discussed above, the passage of time here was almost a month. Even if Berghuis's action was retaliatory, nothing in the record suggests that at this point Chaffee knew or should have known that Berghuis's order was meant to retaliate and not based on additional information obtained during the course of the intervening month. *See Thaddeus-X*, 175 F.3d at 393 (citing *Villanueva*, 659 F.2d at 854).

### d. Conclusion

The district court's conclusion with respect to Chaffee suffered from the same legal error regarding proximate causation in a retaliation case as the district court's

---

[18]At his deposition, which King offered to the district court in support of summary judgment, Chaffee conceded that "99 percent of the time, [increases in security] are punitive." R. 130, Ex. 7 (Chaffee Dep. at 28:11-14).

conclusion with respect to Wells. In light of the overwhelming record evidence demonstrating Chaffee's actions were motivated by King's protected conduct, the district court also clearly erred in finding that Chaffee was not improperly motivated. We therefore hold that the district court erred in entering judgment against King in favor of Chaffee with respect to some, but not all, of his undisputed acts in this case. The judgment in favor of Chaffee is vacated, and we remand for further proceedings consistent with this opinion.

### 3. Assistant Deputy Warden Michael Singleton

Singleton's sole act that could be tied to King's increase in security was approving the backdated security screen created by Chaffee. The district court found that he had "no participation in the decision to reclassify King to Level III" and was "bound" by the decision from Central Office. *King IV*, 2009 WL 3424221, at *7. Although we agree that Singleton did nothing to cause the initial decision to increase King's security, this alone does not relieve Singleton of liability. As the individual signing the backdated security screen approving King's transfer to the increased security facility, Singleton cannot escape liability if in following this order he knew or should have known that he was implementing punishment for King's exercise of his rights. *Thaddeus-X*, 175 F.3d at 393.[19]

Here, however, the district court did not find (and the record does not suggest), that Singleton had any knowledge or should have had knowledge that the revised security screen was backdated or that the statement that "prisoner manipulates other prisoners to be disruptive/needs higher level of security" was in response to any particular activity, let alone King's participation in protected conduct. R. 172 (Trial Tr. II at 212:2-21) (Singleton's testimony regarding lack of knowledge and general practice not to backdate). Nothing on record suggested that Singleton was aware of any underlying constitutional violation that he could be deemed to have assisted in signing

---

[19]As with Wells, it is unclear whether signing a security screen is an act of implementing someone else's order or if it was a supervisory act of approval. However, because the district court treated Singleton as "bound" by Central Office's order, we do the same.

the screen, nor does the screen on its own suggest a constitutional violation is occurring.[20]  Singleton also helped resolve in King's favor the February misconduct ticket reported by Bonnie Lewis.  R. 172 (Trial Tr. II at 218:20-24).  Nothing suggests that Singleton knew or should have known that the increase in security level was a violation of King's constitutional rights.  On this record, we cannot say that the district court's conclusion that Singleton lacked a retaliatory motive was clear error.  We therefore affirm the district court's judgment in favor of Singleton.

### 4. Warden Mary Berghuis

The district court's findings with respect to Warden Berghuis are somewhat unclear, but the record is again not disputed with respect to what acts she took.  Warden Berghuis took two actions that King argues implicate her in the increase in King's security level.  First, she signed the transfer order executed by Chaffee stating "Prisoner manipulates other prisoners to be disruptive," which led to his transfer to the higher security level facility.  R. 130-3, Ex. 26 (Transfer Order).  Second, she also instructed Chaffee to create the new screen in June of 2000.  R. 130-3, Ex. 20 (Zamiara/Berghuis Email); R. 171 (Trial Tr. I at 149:7-11) (Chaffee testimony).

As an initial matter, we must evaluate Warden Berghuis under the theory of supervisory liability under § 1983.  Liability will not lie absent active unconstitutional behavior; failure to act or passive behavior is insufficient.  *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998), *cert. denied*, 526 U.S. 1115 (1999).  Warden Berghuis will be liable for the unconstitutional acts of her subordinates only if she actively participated in the unlawful conduct, such as if she "'implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'"

---

[20]Although Singleton admitted that he was aware that King was transferred to Brooks from Saginaw on concerns relating to "personal property issues," and he believed such issues to be part of the *Cain* case, there is nothing in the record connecting those concerns to the statements on the screen signed by Singleton.  Singleton himself assumed at trial that Wells must have spoken to him about the transfer, but it is unclear what Wells said.  Singleton may have also been aware of the Wells memo, as Deputy Warden Harry handwrote a message to him on the memo stating "Singleton[,] please see me to discuss asap," dated 4/21/2000. R. 11-2, Ex. F (Wells Memo).  The record does not establish, however, what role the information from Wells played, if any, in motivating Singleton to sign the Transfer Order, nor does it establish that Singleton knew or should have known that this information from Wells played a part in the security increase.

*Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)) (emphasis omitted).

The evidence presented a trial demonstrated that Berghuis at a minimum had knowledge of King's protected conduct. Berghuis testified at trial that she was not aware that King was involved in *Cain*, R. 172 (Trial Tr. II at 228:13-16), but she did not deny receiving a letter from King, the subject of which was "Retaliation/Cain v. MDOC," *id.* at 228:1-6. Berghuis further admitted that the *Cain* case was a problematic case for the department. *Id.* at 228:7-16. She was also aware of King's participation in the Warden's Forum and his assistance to other inmates in filing grievances. *Id.* at 229:24-230:5. She testified at trial that "[n]othing he did in terms of the grievance contacts stood out in my mind ever as being abnormal, unusual. In the forum it didn't either." *Id.* at 236:10-12. Her distaste for King was evidenced by her statements that King "has a huge ego" and was a "very difficult to manage prisoner" who "superimposes his will over the will of the department," but, even if she acted out of distaste for a prisoner, that is not the same as unconstitutional retaliation. R. 172 (Trial Tr. II at 135:10-17; 237:2-238:2).

Despite Berghuis's knowledge of King's protected conduct, nothing about the transfer order she signed suggested any potential constitutional violation or retaliation was afoot. The record does not demonstrate any knowledge of the Wells Memo or Chaffee's email to Central Office. Nor did Berghuis speak with anyone at Central Office. Although Berghuis was aware of the protected conduct, she also was aware of the transfer order to Brooks that described King as organizing a protest. R. 130, Ex. 31 (Transfer Order). Without some level of knowledge of the underlying constitutional violation—that the increase was related to his participation in protected conduct—Berghuis cannot be liable for the acts of her subordinates. *Siggers*, 652 F.3d at 695 (granting summary judgment for warden who merely approved notices filed against the inmate).

By June of 2000, however, Berghuis received additional information that could have made her aware that the decision to increase King's security level was for

impermissible purposes.  On June 14, 2000, Berghuis received an email from Zamiara expressing concerns over a claim of retaliation.  R. 130, Ex. 20 (Zamiara/Berghuis Email).  Zamiara also included a copy of the original screen that would have shown the markings from Chaffee that the prisoner had no major misconducts and was "manageable in Level II."  Rather than causing Berghuis to question the increase in security level, she "chewed out" Chaffee and instructed him to fix the screen.  R. 171 (Trial Tr. I at 133:11-19; 147:24-148:3; 149:7-11).  Although this was hardly an exemplary course of conduct, the record does not establish that this "fix" was necessary to maintain King's security status at the higher level, or had any impact on his security level.  As a result, we cannot say that Warden Berghuis's actions constituted active participation in maintaining a constitutional violation.  *See Taylor*, 69 F.3d at 81 (holding triable issue of whether supervisor could be liable for abandoning duties despite actual knowledge of breakdown in proper procedures by department) (citing *Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992)).  We therefore affirm the district court's judgment in favor of Berghuis.

### 5.  Classification Specialist Chuck Zamiara

Chuck Zamiara is the only defendant from Central Office, where the decision to raise King's security was made.  Defendant Zamiara claims that Nick Ludwick, the Classification Director, was the one who made the ultimate decision.  No one disputes that Ludwick had to sign off on the decision because King was listed as "CFA Hold," correctly or not.  No one disputes that Zamiara emailed Chaffee with the instructions to raise King's security level and later emailed Berghuis to adjust the initial screen.  R. 130-3, Ex. 18 (Chaffee/Zamiara Email); R. 130-3, Ex. 20 (Zamiara/Berghuis Email).  The district court did not state specifically whether Zamiara was "involved" in the decision to increase King's security level as it did with the others, but the district court did note that "[n]either Zamiara nor Ludwick could testify with any certainty which of them first recommended that King be transferred to a Level III facility."  *King IV*, 2009 WL 3424221, at *8.

At trial, Zamiara adamantly maintained that Ludwick made all the decisions with respect to raising King's security level. R. 172 (Trial Tr. II at 162:14-16) ("That would not have been my decision."); *id.* at 165:12 ("That is the message I relayed from Mr. Ludwick."); *id.* at 166:3-4 ("Well, if we use a little logic, we can say it came from Mr. Ludwick."). Zamiara did not dispute, however, that he was the one who received Chaffee's email and responded to it with the instructions to increase King's security level and what to note in the transfer screen. *King IV*, 2009 WL 3424221, at *7-8. Although generally finding all of the witnesses credible, including King,[21] the district court was particularly "impressed" by Zamiara, *id.* at *7, despite Zamiara's frequent sarcasm that is apparent even from the written record, *see* R. 172 (Trial Tr. II at 163:17-24).[22]

Zamiara's best efforts aside, however, placing the final decision entirely on Ludwick's shoulders has no bearing on whether Zamiara can be held legally responsible for the resulting adverse action. Thus, Zamiara's credibility on this issue is ultimately not relevant because Zamiara admitted the relevant facts relating to his *participation* in the increase even if he denied being the *decision maker*. Zamiara's acts were a

---

[21]The district court found that "King's testimony was generally credible, but his testimony was colored by his high opinion of himself." *King IV*, 2009 WL 3424221, at *5.

[22]Zamiara's credibility on this issue is highly questionable for a number of reasons. First, the defendants themselves did not credit Zamiara's testimony in their proposed findings of facts. The defendants acknowledged that Zamiara "may have had a role in increasing King's security level" and that he "may have made a recommendation to Ludwick before Ludwick ultimately made the decision that King's security should be raised to Level III." R. 163 (Defs.' Proposed Findings of Fact and Conclusions of Law at ¶ 52). Second, Zamiara's statements at trial were progressively stronger compared to his deposition, which in turn was stronger than his affidavit given in 2003. At his deposition, he admitted that the language in the email to Chaffee may have been his own. R. 172 (Trial Tr. II at at 166:16-18 (quoting his deposition)). His affidavit, which was plagued by the same passive voice that seems to follow most decisions in this case, made no reference at all to any involvement by Ludwick other than being forwarded a copy of the emails. R. 130-4, Ex. 34 (Zamiara Aff. at ¶ 9-10) ("I believed prisoner King was establishing a pattern of manipulative behavior . . . . [P]risoner King was departed to level III because he was perceived as a disruptive prisoner who was manipulating others to create unrest . . . ."). Third, Ludwick's deposition testimony, which was admitted in lieu of trial testimony, also suggested that the idea to raise King's security first came from Zamiara. R. 140-2, Ex. 2 (Ludwick Dep. at 19:9-11) ("Then, at that point in time, it would have been Mr. Zamiara's determination that Mr. King would be better suited at a higher level of custody."); *id.* at 19:15-20:5 ("Q: . . . did he come in, making a recommendation of what he was seeking approval to do? A: Yes. . . . Q: . . . Did he actually, at that point, then, make a recommendation that I think we should send him to URF in level III? A: Yes."). Finally, even Zamiara's description of the process for initiating a transfer of someone on the hold list also conveniently distanced himself from any decision making, but was inconsistent with how Chaffee and Ludwick described it. Chaffee and Ludwick both indicated that Zamiara would first approve the transfer, and then Ludwick or Bolden would need to approve lifting the hold to permit the transfer to occur. R. 130, Ex. 7 (Chaffee Dep. at 19:18-25); R. 140-2, Ex. 2 (Ludwick Dep. at 19:17-20:25).

proximate cause of the increase in King's security level, even if Ludwick had to approve it. The only question is, therefore, whether Zamiara was motivated by King's protected conduct.

The district court found that Zamiara's motivation was not because King was engaging in protected activities, but "because he was using his influence over other prisoners to create problems and was undermining the authority of prison officials." *King IV*, 2009 WL 3424221, at *9. For all the reasons already discussed, this finding is clear error in light of the fact that the only "problems" on the record that Zamiara was aware of were protected activities—assisting others to file grievances and participating in the Warden's Forum. The only information that Zamiara had regarding King was in the email from Chaffee. R. 172 (Trial Tr. II at 166:19-167:20). In that email, Chaffee indicated that King could instigate other prisoners to create "problems," listing as examples grievances and complaints to the Warden's Forum. R. 130-3, Ex. 18 (Chaffee/Zamiara Email). Zamiara was unable to identify any other disruptive conduct or source of information other than the email when discussing why he believed an increase in King's security was appropriate.[23] Zamiara's sole information regarding King's behavior appears to have come from Chaffee.[24] Zamiara's motivation was at least in part to punish King for his protected activities—he did not have to know King

_____

[23]And for good reason—Zamiara and King's counsel had a long exchange at Zamiara's deposition in which Zamiara continued to insist that there were a number of possibilities other than Chaffee's email behind why he would state that King manipulated others into causing arrest, but when given the entirety of Central Office's file on King and a brief recess to review it, Zamiara conceded that there was nothing in the file other than Chaffee's email that would corroborate that statement. R. 130-3, Ex. 19 (Zamiara Dep. at 75:14-77:13).

[24]The dissent suggests Zamiara cannot be liable for the act of increasing King's security based Chaffee's references to King's protected conduct, because Chaffee was not himself motivated to retaliate when he sent the email. Although we take issue with the dissent's discussion of Chaffee's motive, the dissent fails to explain why the lack of a retaliatory animus in Chaffee's email should have any bearing on Zamiara's ultimate decision to increase King's security when the email itself clearly outlines the protected conduct. If a guard seeks a non-retaliatory reprieve from an overly litigious prisoner, and the transfer coordinator upon hearing this decides instead to punish the prisoner, certainly the transfer coordinator could be liable for his act of retaliation. The dissent does not dispute that Chaffee's email identified protected conduct and that Zamiara made his decision based entirely on the content of that email. Dissent Op. at 38. Instead, the dissent suggests that Zamiara was motivated to act because King was "instigating prisoners," which would be a valid point if that is all that Chaffee's email had actually said. The dissent neglects to add that Zamiara only knew King to be "instigating prisoners" *to engage in protected conduct*, and not any other kind, a factual point the dissent does not—and could not—dispute.

personally for this action to be unconstitutional. The district court's finding with respect to Zamiara's motivation was therefore clear error.

Zamiara was also involved in the later action of asking Chaffee to edit the security screen. As discussed above with Warden Berghuis, although this was hardly an appropriate reaction to the concerns identified by the state's attorney about potential legal action from the error, there was no evidence presented that the revision to the screen was necessary to maintain or implement the adverse action. Because the relevant adverse action was the initial increase itself, we cannot say that the act of backdating the screen *caused* the adverse action or even prolonged it, even if it was motivated in part by a continued desire to punish King for the exercise of his constitutional rights.

As with defendants Wells and Chaffee, the district court's judgment with respect to Zamiara applied the wrong legal standard and made a key finding of fact unsupported by the record evidence and explicitly contradicted by other undisputed evidence. We therefore vacate the judgment in favor of Zamiara and remand for further proceedings consistent with this opinion.

**E.  Defendants' Actions Absent Protected Activity**

Having found that the record demonstrates a causal connection between the adverse action and King's protected conduct for Wells, Chaffee, and Zamiara, we next must determine whether these defendants have shown by a preponderance of the evidence that they would have taken the same action absent the protected conduct. *Mt. Healthy*, 429 U.S. at 285; *Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002). The district court devoted one sentence to whether the defendants would have taken the same action in the absence of King's protected activity: "Moreover, even if they were motivated in part by any protected conduct, the Court finds that Defendants would have taken the same action in the absence of King's protected activity." *King IV*, 2009 WL 3424221, at *9. This conclusion is not further explained and is unsupported by the record.

The only suggestion on the record of King creating any disturbances unrelated to his protected conduct is the Wells Memo.  In her memo, Wells cites several concerns that standing alone would be worrisome.  She provides quotes from King, stating "these guys in the unit will do whatever I ask," and "if I wanted to cause a disturbance I could anytime."  R. 11-2, Ex. F (Wells Memo).  She also states that the officers believed that "King's authority over other prisoners is higher then [sic] the officers" and that the officers believed that King had "developed a cadre of followers over whom he has substantial influence. *Id.*

Wells herself cannot merely point to this Memo as proof that she would have acted the same way regardless of King's protected activities because, as already discussed, she was unable to offer even minimal substantiation of any of these statements, and her bias against King was evidenced by her acts of instructing other officers to fabricate misconduct tickets against him.  And although these statements would support a recipient's decision to increase King's security, neither Chaffee nor Zamiara can rely on them because neither man testified that they read this Memo or acted as a result of these statements.  Chaffee testified that his knowledge came from Harry; Zamiara's knowledge came from Chaffee. R. 171 (Trial Tr. at 141:14-21); R. 172 (Trial Tr. II at 166:19-167:20).

Every witness who testified that they were motivated by King's "disruptive" behavior could not point to any other disruptive behavior aside from the grievances, the participation in the Warden's Forum, or the personal property issues raised in *Cain*.  Absent the protected conduct, the "disturbances" would not have existed, and no action would have been taken.  The defendants have not produced any evidence, let alone a preponderance, that they would have each taken the same actions against King had he not been engaging in protected conduct. *See Mt. Healthy*, 429 U.S. at 287.  Because the defendants have failed to show any basis in the record for increasing King's security other than his purportedly disruptive First Amendment conduct, the defendants have failed to defeat King's claim for First Amendment retaliation.  The district court erred in concluding otherwise.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court with respect to defendants Singleton and Berghuis and **REVERSE** the judgment with respect to defendants Wells, Chaffee, and Zamiara. We **REMAND** the case for entry of judgment in favor of King against those three defendants with instructions to the district court to proceed thereafter with a determination of the appropriate remedy, including any declaratory relief or damages to the extent necessary to afford relief in this case.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

BECKWITH, Senior District Judge, concurring in part and dissenting in part. I concur in the majority's disposition of King's appeal with respect to his retaliation claims against Defendants Singleton and Berghuis. I also agree with the majority that no liability should attach to Defendants Chaffee and Zamiara for backdating a new security screen to indicate that King's transfer should include a security level increase. I believe, however, that the majority's causation analysis with respect to King's claims against Defendant Wells and Chaffee and Zamiara for increasing his security level is flawed and omits a crucial piece of testimony that came from King himself.

Briefly summarized, the chain of events in this case was that Wells requested that King be transferred to another unit within Brooks, allegedly for engaging in disruptive and manipulative behavior. Instead of transferring King within the institution, Deputy Warden Harry instructed Chaffee to transfer King to another Level II institution. Chaffee actually made arrangements to transfer King to another Level II institution, but had to receive authorization from the Central Office to complete the transfer. Chaffee requested approval for the transfer from Zamiara, and Zamiara, seeing that one of the reasons for the request was that King was instigating other prisoners, sought and obtained approval to increase King's security level. Zamiara then instructed Chaffee to increase King's security level and transfer him to a level III institution.

First, assuming that the district judge's conclusion that Wells did not bear any retaliatory animus toward King was clearly erroneous, Wells only requested that King be transferred within the institution. The majority seems to agree that transferring King within the institution would not have constituted an adverse action. Majority opinion at 17 ("Wells nominally asked for a transfer."). The majority then summarily concludes that "an increase in security was nonetheless a reasonably foreseeable consequence of the allegations in her Memo." *Id.* The majority cites no evidence in the record to support this conclusion, however, because there is none. If Wells's memo was supposed

to have contained code words she knew would result in an increase in King's security level, they did not register with Deputy Warden Harry because she directed Chaffee to transfer King to another Level II institution. A transfer to another institution at the same security level would not have been an adverse action. *Friedmann v. Corrections Corp. of Am.,* 11 F. App'x. 467, 471 (6th Cir. 2001). In any event, since Harry apparently did not believe that Wells's memo was alarming enough to recommend increasing King's security level, I cannot conclude that it was reasonably foreseeable to Wells that a security level increase would result from her memo.

Second, and this is the crucial evidence the majority fails to mention, King testified that *he does not believe that Harry retaliated against him.* Trial Trans. (Vol. I) at 112 ("I didn't bring suit against the deputy warden, Shirlee Harry, because even though her signature was on stuff, I don't believe she had malice in her heart, and as the testimony and the depositions have proven, she didn't."). In my view, King's admission that Harry did not intend to retaliate against him makes her request to transfer King to another institution the intervening cause of his security level increase, and absolves Wells from liability for any retaliatory motive she had in requesting King's transfer in the first instance. Stated another way, since King failed to prove that it was reasonably foreseeable to Wells that her memo would result in an increase in King's security level, Harry's direction to Chaffee to transfer King to another institution became the "but for" cause of the adverse action because Zamiara's actions were based on the transfer request that Chaffee made at Harry's direction. If Harry did not intend to retaliate against King - and he admits she did not - then her directive to Chaffee to transfer King cannot have been retaliatory. Moreover, Harry only requested a "break" from King due in part to his litigious activities, which was perfectly appropriate under the law of this Circuit. *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir. 1995).

This last point is especially important to analyzing causation with respect to Chaffee and Zamiara. Chaffee testified that in requesting approval for the transfer from Zamiara, he essentially repeated verbatim the reasons for the transfer given to him by Deputy Warden Harry. Trial Trans. (Vol. I ) at 140-42, 150-51. As just stated, Harry's

directive to transfer King to another Level II institution in order to give the staff a break was facially legitimate. King produced no evidence that Chaffee knew or should have known that he was not actually instigating other prisoners to defiance. Indeed, King's trial counsel elicited from Chaffee on direct examination that he did not have any first hand knowledge whether King was instigating other prisoners. Trial Trans. (Vol. I) at 139. Thus, King failed to show that Chaffee knew or should have known that the reasons Harry gave him for the transfer were false or given for retaliatory reasons. Therefore, King failed to prove that in facilitating his transfer, Chaffee acted with retaliatory intent. *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999) (holding a subordinate will be liable under § 1983 for following a superior's orders if he knew or should have known his acts were violating plaintiff's constitutional rights). Indeed, Chaffee cannot have known of any retaliatory motive for the transfer since King admits that Harry had no such motive. Consequently, the only logical conclusion that can be reached is that Chaffee in fact did not intend to retaliate against King when he relayed Harry's reasons for the transfer to Zamiara.

The causation analysis is much the same for Zamiara. Zamiara received an email from Chaffee requesting a transfer which indicated that the prisoner was instigating other prisoners to disobedience. Zamiara is even further removed from the situation than Chaffee. Zamiara testified that the indication that King was instigating prisoners caused him to request an increase in King's security level. Trial Trans. (Vol. II) at 183-84. King produced no evidence that Zamiara knew or should have known that the reasons Chaffee gave him for requesting King's transfer were false or retaliatory. Indeed, the majority specifically recognizes that Zamiara's sole source of information about King's alleged conduct came from Chaffee's email. Majority Opinion at 32. If Chaffee's email was not tainted with retaliatory animus - and the evidence clearly shows that it was not - then Zamiara's reliance on the information in the email to increase King's security level cannot have been retaliatory.

The lack of retaliatory motive from Zamiara then flows back down to Chaffee, who changed King's security level at Zamiara's direction. If Zamiara did not intend to

retaliate against Chaffee by increasing his security level, Chaffee cannot be held liable for retaliation when he followed Zamiara's directive to do so. Moreover, even if Zamiara did intend to retaliate against King, King produced no evidence that Chaffee knew or should have known that Zamiara was retaliating against King by increasing his security level. Furthermore, contrary to the majority's analysis, it is inconsequential that Chaffee admitted in his deposition that normally security level increases are punitive since King failed to show that Chaffee knew or should have known that the alleged punitive measure was related to his protected activity. Consequently, Chaffee cannot be liable for retaliation for following Zamiara's direction to increase King's security level.

In short, in my opinion the record rather indisputably shows that although Chaffee and Zamiara may have relied on false or inaccurate information in transferring King and increasing his security level, they did so in good faith and without retaliatory motive. Even if Wells did intend to retaliate against King when she requested that he be transferred to another unit within Brooks, King failed to prove that it was reasonably foreseeable to Wells that a security level increase would result from her actions.

For all of these reasons, the district court's judgment should be affirmed *in toto*. Accordingly, I respectfully dissent from the Court's opinion to the extent it reverses the district court's judgment as to Defendants Wells, Chaffee, and Zamiara.